Sean GALLAGHER, Appellant,

v.

BNSF RAILWAY COMPANY,
Respondent.

No. A12–1327.

Court of Appeals of Minnesota.

April 8, 2013.

Michael F. Tello, Michael P. McReynolds, Tello Law Firm, Anoka, MN; and Frederic A. Bremseth, Christopher J. Moreland, Bremseth Law Firm, P.C., Minnetonka, MN, for appellant.

Eric E. Holman, Emily Curtner–Atkinson, Diane P. Gerth, Ricke & Sweeney, P.A., St. Paul, MN, for respondent.

Considered and decided by HOOTEN, Presiding Judge; CLEARY, Judge; and SMITH, Judge.

## OPINION

CLEARY, Judge.

Appellant Sean Gallagher sustained personal injuries while coupling railroad cars for his employer, respondent BNSF Railway Company. He commenced this action, alleging that his injuries resulted from respondent's violation of the Safety Appliance Act (SAA) and negligence under the Federal Employers' Liability Act (FELA). The district court granted summary judgment for respondent, and appellant challenges that decision, asserting that genuine issues of material fact exist as to both claims. We reverse and remand.

## FACTS

This case involves the mechanisms used to couple railroad cars. Each end of a railroad car has a drawbar, which is a metal bar that is fastened to a housing mechanism on the car and extends out from the end of the car. On the end of each drawbar is a knuckle, which is a clamp that is capable of interlocking with another knuckle. In theory, if an open knuckle on one car engages a knuckle on another car when the two cars come together, a pin will drop automatically, locking the two knuckles into place, and the cars will be "coupled." A hump is a man-made hill over which cars are pushed so that they impact cars at the bottom of the hill, or bowl, with enough force to couple automatically. These mechanisms were designed to eliminate the need for railroad employees to go between cars to couple them.

Drawbars are designed to pivot laterally in their cars' housings, which prevents coupled cars from derailing as they move along curved railroad tracks. As a result, a car's drawbar and knuckle may be off-center when the car comes together with a second car, and this misalignment will prevent the two knuckles from engaging and the two cars from coupling. Drawbars must be realigned manually by railroad employees to ensure proper coupling.

On July 24, 2010, appellant was working in respondent's Northtown rail yard. Appellant was checking to ensure that cars had coupled after being pushed over the hump when he noticed that numerous bulkhead flat cars had failed to couple on a curved portion of track. Appellant realigned several drawbars and completed the coupling of a number of cars. He then went between two uncoupled cars and made multiple attempts to get the cars to couple. Appellant claims that, during one of these attempts, he heard and felt a "pop" in his lower back and that he sustained personal injuries. Appellant was eventually able to get the two cars to couple.

Appellant subsequently filed a complaint alleging that he had suffered severe and disabling bodily injuries as a result of respondent's negligence and violation of federal law. Respondent filed a motion for summary judgment, arguing that appellant had failed to set forth any facts upon which respondent might be found negligent and had failed to identify a defect in any railroad equipment that would give rise to liability under federal law. Appellant filed a cross motion for summary judgment on his claim of violation of federal law, arguing that respondent was strictly liable for its cars' malfunctioning coupling mechanisms. Following a hearing, the district court issued an order denying appellant's motion and granting summary judgment for respondent. The court determined that appellant had failed to raise a genuine issue as to whether respondent's equipment had malfunctioned, in violation of federal law, and had failed to raise genuine issues on the elements of breach, causation, and foreseeability for his negligence claim. This appeal followed.

## ISSUES

I. Did the district court err by granting summary judgment for respondent on appellant's claim of violation of the SAA?

II. Did the district court err by granting summary judgment for respondent on appellant's claim of negligence under the FELA?

## ANALYSIS

A district court's summary-judgment decision is reviewed de novo. *Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC,* 790 N.W.2d 167, 170 (Minn.2010). The role of an appellate court when re-

viewing a grant of summary judgment "is to determine whether there are any genuine issues of material fact and whether the [district] court erred in its application of the law." *Wartnick v. Moss & Barnett*, 490 N.W.2d 108, 112 (Minn.1992). The appellate court may not weigh the evidence or make factual determinations, but must consider the evidence in the light most favorable to the party against whom summary judgment was granted. *McIntosh Cnty. Bank v. Dorsey & Whitney, LLP*, 745 N.W.2d 538, 545 (Minn.2008).

A motion for summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. The party moving for summary judgment has the burden to show that summary judgment is appropriate. *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 364 (Minn.2009). "[S]ummary judgment is inappropriate when reasonable persons might draw different conclusions from the evidence presented." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn.1997).

## I. The district court erred by granting summary judgment for respondent on appellant's claim of violation of the SAA.

■ Under the SAA, a railroad carrier is permitted to use a vehicle on its railroad lines only if that vehicle is equipped with "couplers coupling automatically by impact, and capable of being uncoupled, without the necessity of individuals going between the ends of the vehicles." . 49 U.S.C. § 20302(a)(1)(A) (2006). "The railroad is liable for an employee's injury or death caused by a violation of the SAA." *Norfolk & W. Ry. v. Hiles*, 516 U.S. 400, 408–09,

116 S.Ct. 890, 895, 134 L.Ed.2d 34 (1996) (stating that "the SAA creates an absolute duty requiring not only that automatic couplers be present, but also that they actually perform," and that liability for a violation of the SAA is not dependent on negligence).

■ To show that railroad equipment is in violation of the SAA, evidence must establish either "some particular defect" in the equipment or "a failure [of the equipment] to function, when operated with due care, in the normal, natural, and usual manner." *Myers v. Reading Co.*, 331 U.S. 477, 483, 67 S.Ct. 1334, 1338, 91 L.Ed. 1615 (1947) (quotation omitted). "The fact that the [equipment] functioned properly on other occasions is immaterial." *Carter v. Atlanta & St. Andrews Bay Ry.*, 338 U.S. 430, 434, 70 S.Ct. 226, 229, 94 L.Ed. 236 (1949); *see also Myers*, 331 U.S. at 483, 67 S.Ct. at 1338 ("Where a jury finds that there is a violation, it will be sustained, if there is proof that the mechanism failed to work efficiently and properly even though it worked efficiently both before and after the occasion in question."). If there is any evidence from which a jury may reasonably infer that the SAA was violated, and that such violation caused a railroad employee's injury, a SAA claim should be submitted to a jury for a verdict. *See, e.g., Carter*, 338 U.S. at 434–35, 70 S.Ct. at 229–30 (reversing a directed verdict for a railroad carrier on a SAA claim because the evidence was sufficient to allow the case to go to a jury); *Myers*, 331 U.S. at 483–86, 67 S.Ct. at 1338–40 (reversing a judgment notwithstanding the verdict issued in favor of a railroad carrier on a SAA claim because the evidence was sufficient to support the jury's verdict for a railroad employee).

■ The SAA is not violated when drawbars become "misaligned during the ordinary course of railroad operations,"

and railroad employees are required to go between cars to manually adjust drawbars. *Hiles,* 516 U.S. at 409–13, 116 S.Ct. at 895–97; *see also Affolder v. N.Y., Chi. & St. Louis R.R.,* 339 U.S. 96, 99, 70 S.Ct. 509, 511, 94 L.Ed. 683 (1950) (stating that liability under the SAA "assumes that the coupler was placed in a position to operate on impact"). While the SAA requires railroad carriers to use particular equipment that functions, a "misaligned drawbar" is not necessarily a "malfunctioning drawbar," but rather an "inevitable byproduct of the ability to traverse curved track and . . . part of the normal course of railroad car operations." *Hiles,* 516 U.S. at 411–12, 116 S.Ct. at 896–97. Whether coupling mechanisms were properly placed is a question of fact for a jury. *See Carter,* 338 U.S. at 434 n. 3, 70 S.Ct. at 229 n. 3.

■ Appellant argues that the evidence creates a genuine issue of material fact as to whether there was an equipment defect or malfunction at the time that he injured himself, making summary judgment for respondent on the claim of a SAA violation inappropriate. Respondent maintains, and the district court held, that "[t]he record contains no evidence of an equipment failure."

During his deposition, appellant testified regarding his multiple attempts to get the two cars that he was working with at the time of his injury to couple. He testified that, when he first approached the cars, their drawbars were not out of line and he thought that they were coupled, but that when he moved the cars away from one another he saw that they were not coupled. He then separated the cars by 50 feet and pushed them back toward one another several times, attempting to get them to couple. Appellant testified that "it looked like the drawbars were straight" when he tried to couple the cars and that he realigned the drawbars after each failed coupling

attempt. He stated that, after one failed attempt, the drawbars "flung" away from him, and that he heard and felt the "pop" in his lower back while realigning one of the drawbars.

When asked whether there was a defect, malfunction, or problem with any equipment when he was injured, appellant responded: "I kept having to retry to couple [the cars] because I couldn't get the pin to fall. Every time I [made] a connection it wouldn't work so I would have to separate [the cars] out." He testified that "[t]he pin should drop, make a connection" and that he "couldn't get parts to work properly." He stated that, if the pin had fallen the first time the drawbars were lined up, he "would not have had to maneuver the car multiple more moves and adjust the drawbars." Appellant testified that he did not inspect the equipment to see "if maybe there was something in the way or something broken" because he "wouldn't even know what to look for."

Respondent contends that appellant's testimony shows that the cars would not couple because the drawbars were not properly aligned, which is not a violation of the SAA, and cites the affidavit of Phillip Mullen, the terminal superintendent of respondent's Northtown rail yard, to support its contention. Mullen stated that the fact that appellant felt the need to realign the drawbars multiple times and that the drawbars "flung" away from him after one unsuccessful coupling attempt shows that the drawbars were never properly aligned until appellant's last, successful attempt to get the cars to couple.

Mullen's affidavit contradicts appellant's testimony that the drawbars were not out of line and that it looked like they were straight, but that he nonetheless could not get the cars to couple when brought together because the pin would not fall into place. Mullen's affidavit also contradicts

the affidavits of Gary Hawley and Tom Kuduk, both former employees of respondent. Hawley and Kuduk stated that, after unsuccessful couplings, "employees are required to separate the cars in the bowl by a minimum of 50 feet, tie a hand brake on the cars not attached to the engine, and readjust the drawbars before attempting to couple the cars together." Resolution of the factual issues of when the drawbars were properly aligned and whether there was an equipment defect or malfunction, as well as determination of which testimony is credible, is not appropriate at the summary-judgment stage. *See Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 320 (Minn.2007) ("Weighing the evidence and assessing credibility on summary judgment is error."); *DLH*, 566 N.W.2d at 70 ("The district court's function on a motion for summary judgment is not to decide issues of fact, but solely to determine whether genuine factual issues exist.").

Respondent claims that appellant initially testified that there was "nothing wrong with the drawbar," that it was "perfectly fine," and that he simply needed to keep realigning it, but that appellant changed his theory and began to allege a problem with the pin "[a]fter a lengthy break in the deposition." Resolution of whether appellant's version of the events changed partway through his deposition, as well as determination of whether to give credit to the earlier or later testimony, is not proper on summary judgment. *See Hoyt*, 736 N.W.2d at 320. The evidence raises a genuine issue of material fact as to whether the SAA was violated.

■ For appellant to succeed on his SAA claim, he will also need to show that his injuries were caused by the SAA violation. *See Hiles*, 516 U.S. at 408, 116 S.Ct. at 895. Once a violation of the SAA is established, liability attaches "if the injury resulted in whole or in part" from the violation. *Carter*, 338 U.S. at 434–35, 70 S.Ct. at 229 (quotation omitted). Appellant testified that he heard and felt the "pop" in his lower back while realigning one of the drawbars after several unsuccessful attempts to get the cars to couple. He stated that, if the pin had fallen the first time the drawbars were lined up, he would not have had to separate the cars, realign the drawbars, and then push the cars together again multiple times. The evidence raises a genuine issue of material fact as to whether appellant's injury "resulted in whole or in part" from a violation of the SAA. *Id.*

■ Because there is evidence from which a jury could reasonably conclude that the SAA was violated, and that such violation caused appellant's injury, the district court erred by granting summary judgment for respondent on appellant's claim of violation of the SAA.

## II. The district court erred by granting summary judgment for respondent on appellant's claim of negligence under the FELA.

■ Under the FELA:

Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51 (2006). What constitutes negligence for the purpose of applying the FELA is a federal question that must be determined by common-law principles as established and applied in the federal

courts. *See, e.g., Consol. Rail Corp. v. Gottshall,* 512 U.S. 532, 543, 114 S.Ct. 2396, 2404, 129 L.Ed.2d 427 (1994); *Urie v. Thompson,* 337 U.S. 163, 174, 69 S.Ct. 1018, 1027, 93 L.Ed. 1282 (1949).

The intent of Congress in passing the FELA was to "provide liberal recovery for injured workers." *Monessen Sw. Ry. v. Morgan,* 486 U.S. 330, 337, 108 S.Ct. 1837, 1843, 100 L.Ed.2d 349 (1988) (quotation omitted); *see also Atchison, Topeka & Santa Fe Ry. v. Buell,* 480 U.S. 557, 561–62, 107 S.Ct. 1410, 1413–14, 94 L.Ed.2d 563 (1987) (explaining that the FELA is a "broad remedial statute," which has been liberally construed in favor of railroad workers). A plaintiff's burden in a FELA action is thus "significantly lighter than it would be in an ordinary negligence case." *Lisek v. Norfolk & W. Ry.,* 30 F.3d 823, 832 (7th Cir.1994). "[B]ecause his burden at trial is so low, a FELA plaintiff can survive a motion for summary judgment when there is even slight evidence of negligence." *Id.* (quotation omitted). The issue of negligence should be submitted to a jury if there is "a reasonable basis in the record for concluding that there was negligence which caused the injury." *Ellis v. Union Pac. R.R.,* 329 U.S. 649, 653, 67 S.Ct. 598, 600, 91 L.Ed. 572 (1947); *see also Eggert v. Norfolk & W. Ry.,* 538 F.2d 509, 511 (2d Cir.1976) ("It is well established that the role of the jury is significantly greater in FELA cases than in common law negligence actions.").

### A. Duty

A railroad carrier has a duty under the FELA to exercise "due care," which is "what a reasonable and prudent man would [do] under the circumstances of the situation." *Tiller v. Atl. Coast Line R.R.,* 318 U.S. 54, 67, 63 S.Ct. 444, 451, 87 L.Ed. 610 (1943). A railroad carrier is "liable for injuries attributable to condi-tions under his control when they are not such as a reasonable man ought to maintain in the circumstances, bearing in mind that the standard of care must be commensurate to the dangers of the business." *Wilkerson v. McCarthy,* 336 U.S. 53, 61, 69 S.Ct. 413, 417, 93 L.Ed. 497 (1949) (quotations omitted).

"[R]easonable foreseeability of harm is an essential ingredient of [FELA] negligence." *Gallick v. Baltimore & Ohio R.R.,* 372 U.S. 108, 117, 83 S.Ct. 659, 665, 9 L.Ed.2d 618 (1963). A railroad carrier's duty is measured by what a reasonably prudent person would or should anticipate under like circumstances. *Id.* at 118, 83 S.Ct. at 665–66; *see also Urie,* 337 U.S. at 178, 69 S.Ct. at 1028 (stating that negligence under the FELA will attach if the railroad carrier "knew, or by the exercise of due care should have known, that prevalent standards of conduct were inadequate to protect [the injured employee] and similarly situated employees") (quotation omitted).

### B. Breach

Appellant argues that respondent breached its duty of care by failing to provide him with "safe equipment, sufficient training, and proper tools." Specifically, appellant contends that respondent should have trained him in the use of certain devices designed to assist railroad workers in the realigning of drawbars, and should have properly cleaned and lubricated drawbars so that they would move more easily. Appellant also argues that respondent breached its duty of care by utilizing "unsafe job procedures" and by failing to "provide sufficient personnel." Specific to this argument, appellant contends that respondent should not have used curved tracks for the coupling of bulkhead flat cars, and should have provided additional workers for the coupling process.

### i. Assistive devices

Appellant states that devices such as "knuckle mates" and "alignment straps" have been designed to assist railroad employees in the moving of drawbars. Appellant cites the report of Michael O'Brien, a railroad safety consultant, who explained that "[t]hese devices certainly ease the physical burden on train crew members when adjusting drawbars." Appellant argues that respondent failed to inform its employees that these devices were available and failed to train its employees in their use, which put him and other employees in danger of being injured while aligning drawbars.

During his deposition, appellant testified that he did not know that there were mechanical devices to help with the moving of drawbars and that he had never used any such device. He further testified that he was not told about these devices during his on-the-job training or told whether they were available at the Northtown rail yard. Hawley and Kuduk, both of whom trained new employees during their employment with respondent, stated in their affidavits that training in assistive devices was not part of respondent's training program.

 A railroad carrier has a responsibility under the FELA to "provide tools that are reasonably safe and suitable for the use of the employee." *Rodriguez v. Delray Connecting R.R.*, 473 F.2d 819, 821 (6th Cir.1973) (leaving for a jury the determination of whether a railroad carrier was negligent under the FELA in failing to provide automatic spike pullers to assist in removing railroad spikes); *see also Heater v. Chesapeake & Ohio Ry.*, 497 F.2d 1243, 1247 (7th Cir.1974) (leaving for a jury the determination of whether a railroad carrier was negligent under the FELA in failing to utilize a mechanical crane for removing heavy yokes from a railroad car);

*Williams v. Atl. Coast Line R.R.*, 190 F.2d 744, 747–48 (5th Cir.1951) (leaving for a jury the determination of whether a railroad carrier was negligent under the FELA in failing to provide life-saving equipment when its employees were repairing a washed-out railroad track). But a railroad carrier "is not required to furnish the employee the latest, best, or most perfect appliances with which to work." *Atl. Coast Line R.R. v. Dixon*, 189 F.2d 525, 527 (5th Cir.1951). Whether respondent breached its duty of care under the FELA by failing to make available to its employees certain assistive devices, and by failing to train its employees in the use of such devices, is a question of fact.

### ii. Clean and lubricated drawbars

Appellant contends that drawbars, which are heavy and require a considerable amount of force to move, can be more difficult to align if not cleaned and lubricated. He argues that the drawbars that he was working with on the day of his injury were not properly cleaned or lubricated, which put him and other employees in danger of being injured while aligning the drawbars.

When asked whether he had trouble moving drawbars on the day of his injury, appellant responded that they were "stiff" and "hard to move." He stated that "[t]he grease wears out and dirt gets in them" and that they "don't get lubricated enough." In their affidavits, Hawley and Kuduk stated that, much of the time, respondent's drawbars are not properly maintained or lubricated and that material such as dirt and rust makes them more difficult to align. Whether respondent failed to properly maintain drawbars, and whether any such failure was a breach of respondent's duty of care under the FELA, are questions of fact.

### iii. Coupling on curved tracks

Appellant states that bulkhead flat cars, the type of car that he was working with when he was injured, have longer drawbars than other types of cars and can be difficult to couple on curved tracks. He argues that requiring employees to complete the coupling of cars with long drawbars on curved tracks, rather than on straight tracks, put him and other employees in danger of being injured.

Appellant testified that respondent's Northtown rail yard contains both curved and straight tracks and that he was working on a curved portion of track at the time of his injury. He testified that he did not get the two cars that he was working on when injured to successfully couple until he moved them to a straight portion of track. In their affidavits, both Hawley and Kuduk stated: "Failed couplings occur more frequently on cars which have long drawbars, such as bulkhead flat cars." They further stated that such cars should be put on straight tracks to make alignment of their drawbars easier and increase the likelihood of successful couplings. According to Hawley, this was previously respondent's practice. Whether requiring employees to ensure the coupling of cars with long drawbars on curved tracks was a breach of respondent's duty of care under the FELA is a question of fact.

### iv. Additional personnel

Appellant contends that two cars have a greater likelihood of coupling if the knuckles on each car are open when the cars impact, rather than only one knuckle being open and the other being closed. He states that respondent only assigned workers to open the front knuckles on the cars that were sent over the hump, while the knuckles to be connected on the cars in the bowl were never opened. Appellant argues that this practice increased the likelihood that employees would need to go

between cars to complete coupling, which put him and other employees in danger of being injured.

In their affidavits, Hawley and Kuduk stated that respondent's practice is to assign one worker as a "pin puller" to work on the hump opening only the knuckles on the front ends of the cars to be sent over the hump, and that the knuckles to be connected on the cars in the bowl are never opened. They stated: "Having knuckles open on both ends of cars increases the likelihood of successful couplings.... With hump operations using only one pin puller, however, only one knuckle is opened and this significantly increases the likelihood of unsuccessful couplings." Hawley stated that "[f]ailed couplings require employees to go between cars to realign drawbars and open knuckles[,] increasing their risk of injury."

Appellant also argues that respondent's practice of assigning only one worker to adjust drawbars put him and other employees in danger of being injured. He cites the affidavit of Kuduk, who stated that, when he began working for respondent, "two switchmen would be on the ground to perform any lining of drawbars or adjusting of them." Kuduk further stated that "[h]aving two employees do this made the job considerably easier and lessened the risk of injury" and that respondent's current practice of having only one employee align multiple drawbars "puts more strain on that person." Whether respondent's practices of opening one knuckle when coupling two cars and assigning one employee to align multiple drawbars were breaches of duty under the FELA is a question of fact.

The district court determined that there was no breach of duty and no injury was foreseeable because "no irregularities were apparent in the Northtown yard on July 24, 2010"; aligning drawbars is common

and necessary in the railroad industry; and appellant "was working in an environment and under conditions that were consistent over time and experienced by numerous employees." But appellant is not arguing that there was any particular irregularity on the day that he was injured that constituted negligence. Rather, appellant is arguing that respondent was negligent in the practices that were used for the coupling process. The evidence raises a genuine issue of material fact as to whether respondent breached its duty of care under the FELA.

### C. Causation

■■■■■ "[A] relaxed standard of causation applies under [the] FELA." *Gottshall*, 512 U.S. at 543, 114 S.Ct. at 2404. A railroad carrier is liable if an injury resulted "in whole or in part" from the carrier's negligence. 45 U.S.C. § 51. If "the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought," then the railroad carrier is liable. *Gottshall*, 512 U.S. at 543, 114 S.Ct. at 2404 (quotation omitted); *see also CSX Transp., Inc. v. McBride*, — U.S. —, 131 S.Ct. 2630, 2636–38, 180 L.Ed.2d 637 (2011) (stating that the FELA's language on causation is "as broad as could be framed" and does "not incorporate any traditional common-law formulation of proximate causation" (quotations omitted)).

Appellant alleges that respondent breached its duty of care by failing to utilize practices that would have increased the likelihood of successful couplings and decreased the need for, and difficulty of, manual alignment of drawbars. Appellant was injured while adjusting drawbars and attempting to get cars to couple. Whether appellant's injuries were caused by any alleged breach is a question of fact.

■■■ Because there is evidence from which a jury could reasonably conclude that respondent breached its duty of care, and that such breach caused appellant's injuries, the district court erred by granting summary judgment for respondent on appellant's claim of negligence under the FELA.

### DECISION

Because there are genuine issues of material fact for trial pertaining to appellant's claims of violation of the SAA and negligence under the FELA, the district court erred by granting summary judgment for respondent.

**Reversed and remanded.**