**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4547
_____

PORT AUTHORITY TRANS-HUDSON CORP.,
                                            Petitioner

v.

SECRETARY, UNITED STATES DEPARTMENT
OF LABOR, AS DELEGATED TO THE
ADMINISTRATIVE REVIEW BOARD,
Respondent

*Christopher Bala,
                        Intervenor

*(Pursuant to the Clerk's Order dated 2/6/14)


On Petition for Review from the Administrative Review
Board of the United States Department of Labor
ARB Case No. 12-048

Argued November 19, 2014

Before: SMITH, HARDIMAN, and BARRY, *Circuit Judges*

(Filed: January 15, 2015)

Megan Lee, Esq. **(ARGUED)**
Port Authority of New York & New Jersey
Litigation and Corporate Security
225 Park Avenue South
13th Floor
New York, NY  10003
        *Counsel for Petitioner*

Steven W. Gardiner, Esq. **(ARGUED)**
United States Department of Labor
Office of the Solicitor
Suite N-2716
200 Constitution Avenue, N.W.
Washington, DC  20210
        *Counsel for Respondent*

Lawrence M. Mann, Esq.
Alper & Mann
9205 Redwood Avenue
Bethesda, MD  20817
        *Counsel for Amicus-respondent*

Ronald M. Johnson, Esq. **(ARGUED)**
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC  20001
        *Counsel for Amicus-petitioner*

Charles C. Goetsch, Esq. **(ARGUED)**
Cahill, Goetsch & Perry
43 Trumbull Street
New Haven, CT  06510
        *Counsel for Intervenor respondent*

Harry W. Zanville, Esq.
Suite 1201
500 West Harbor Drive
San Diego, CA  92101
        *Counsel for Amicus-respondent*

_____

OPINION

_____


SMITH, *Circuit Judge*.

Petitioner railroad Port Authority Trans-Hudson Corporation ("PATH") challenges a decision and order of the Administrative Review Board of the United States Department of Labor, which held that PATH violated the Federal Railroad Safety Act when it suspended one of its employees for excessive absenteeism.  Specifically, PATH was held to have violated an anti-retaliation provision, 49 U.S.C. § 20109(c)(2), which prohibits railroads from disciplining employees "for following orders or a treatment plan of a treating physician."  The physician's order which the employee was following related to treatment for an *off-duty* injury.  Reading

3

subsection (c)(2) in context, we agree with PATH that only physicians' orders which stem from *on-duty* injuries are covered.

Accordingly, we will grant the petition.

**I.**

Intervenor Christopher Bala is a unionized signal repairman who has worked for PATH since 1990. Per PATH's agreement with Bala's union, signal repairmen of Bala's seniority are entitled to 12.5 paid holidays and 23 paid vacation days per year. Separate from this allotment of paid holidays and vacations, Bala took in excess of 600 sick and personal days through 2008.[1] In 2007 alone, Bala took 82 sick days, compared to the 17 days of sick leave per year taken by unionized signalmen at PATH, on average, between 2002 and 2008. As a result of these absences, PATH issued numerous warnings to Bala over the years that if his attendance did not improve formal disciplinary action might be taken.

On June 22, 2008, Bala experienced back pain while moving boxes at his home. The next day, Bala's

---

[1] Under the union agreement, if Bala is "prevented from performing [his] duties by reason of sickness," he is to be paid in full for up to 65 days of sick leave annually, and to receive half-pay for an *additional* 195 days annually. Bala did not bring a claim pursuant to that agreement.

physician ordered him off work through July 2008. On July 14, 2008, PATH followed through on its prior warnings, and notified Bala that an internal hearing would be held regarding his absenteeism. As a result of that hearing, PATH suspended Bala for up to six days (partially contingent on improved attendance), without pay, for violating PATH's attendance policy. The suspension was based on the sum total of Bala's absences, including but not limited to those following his June 22, 2008 back injury.

Bala filed a complaint with the Respondent in this case, the United States Secretary of Labor, alleging that the suspension was retaliation for taking statutorily protected sick leave. The Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20101 *et seq.*, provides that "[a] railroad carrier . . . may not discipline . . . an employee . . . for following orders or a treatment plan of a treating physician." 49 U.S.C. § 20109(c)(2).[2] Although subsection (c)(2) immediately follows a provision prohibiting railroads from "deny[ing], delay[ing], or

---

[2] Claimants alleging retaliation for taking statutorily protected sick leave often rely on the Family and Medical Leave Act ("FMLA"), which provides workers protected sick leave and is accompanied by an anti-retaliation provision. But at oral argument, Bala's counsel expressed some skepticism that Bala would have qualified under the FMLA due to his prior absences.

5

interfer[ing] with the medical or first aid treatment *of an employee who is injured during the course of employment*," 49 U.S.C. § 20109(c)(1) (emphasis added), Bala argued that subsection (c)(2) applies regardless of where an employee is injured. An Administrative Law Judge ("ALJ") agreed and held that PATH violated the FRSA by disciplining Bala for following his physician's orders not to work after his off-duty injury,[3] and awarded Bala just over $1,000 in back pay for the days he was suspended. The Administrative Review Board ("ARB") of the United States Department of Labor ("DOL") upheld the ALJ's award in *Bala v. Port Authority Trans-Hudson Corp.*, ARB Case No. 12-048, 2013 WL 5773495 (Sept. 27, 2013).

In upholding the award, the ARB rejected PATH's argument that subsection (c)(2) is limited to physicians' orders stemming from *on-duty* injuries. However, a mere 14 months earlier, in *Santiago v. Metro-North Commuter Railroad Corp.*, ARB Case No. 10-147, 2012 WL 3164360 (July 25, 2012), a different ARB panel (albeit

---

[3] The ALJ heard arguments that because Bala had previously injured his back at work, his subsequent back injury at his home constituted an aggravation of an on-duty injury, and accordingly would still be covered even if subsection (c)(2) only applied to on-duty injuries. As this issue was not raised below or to this Court, it is waived.

6

comprised of two of the same three members) stated just the opposite, that subsection (c)(2) "identifies protected activity as . . . complying with treatment plans for *work* injuries." *Id.* at \*5 (emphasis added). The *Bala* panel, while citing *Santiago* seven times, failed to address this clear contradiction.

PATH petitioned this Court to set aside the ARB's decision and order, and presented two questions: (1) whether subsection (c)(2) applies to orders of treating physicians that stem from *off-duty* injuries; and (2) assuming the statute's application to off-duty injuries, whether there was sufficient evidence to find that PATH disciplined Bala because of such protected absences. We conclude that Congress intended the entirety of subsection 20109(c) to apply only when an employee sustains an injury during the course of employment. It is, therefore, unnecessary for us to reach the second question of the sufficiency of the evidence. We will grant PATH's petition.

## II.

The ARB had jurisdiction, as delegated to it by the Secretary of Labor, pursuant to 49 U.S.C. § 20109(d)(1). We have jurisdiction over this appeal pursuant to 49 U.S.C. § 20109(d)(4).

We review the ARB's decision to determine if it was, *inter alia*, "arbitrary, capricious, an abuse of

7

discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A); *Doyle v. U.S. Sec'y of Labor*, 285 F.3d 243, 248-49 (3d Cir. 2002). While "we exercise plenary review in deciding questions of law," *id.* at 249, our review is potentially subject to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984). However, "when we are called upon to resolve pure questions of law by statutory interpretation, we decide the issue de novo without deferring to an administrative agency that may be involved." *Patel v. Ashcroft*, 294 F.3d 465, 467 (3d Cir. 2002) (superseded by statute on other grounds).

## III.

Before the FRSA was amended by the Rail Safety Improvement Act of 2008 ("RSIA"),[4] 49 U.S.C. § 20109

---

[4] Pub. L. No. 110–432, 122 Stat. 4848 (October 16, 2008). As the RSIA was passed four months *after* Bala's injury, the ARB briefly addressed retroactivity concerns and held that because Bala's suspension was not handed down until after the statute was passed, there was no retroactivity problem. Since this issue was not raised on appeal, it is waived. *Gonzalez v. AMR*, 549 F.3d 219, 225 (3d Cir. 2008); *Ordway v. United States*, 908 F.2d 890, 896 (11th Cir. 1990) (non-retroactivity is an affirmative defense which a court need not always resolve *sua sponte*).

8

was exclusively an anti-retaliation provision. Subsections (a) and (b) of § 20109 provided (and still provide) protections to employees who assist in investigations into railroad safety, refuse to violate laws pertaining to railroad safety, notify a railroad or the Secretary of Transportation about "work-related" injuries or illnesses, and report and/or refuse to work in hazardous conditions. The RSIA inserted a new subsection (c), containing both an anti-retaliation provision, subsection (c)(2), and a more direct worker safety provision, subsection (c)(1):

**(c) Prompt medical attention.**—

> **(1) Prohibition.**--A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of *an employee who is injured during the course of employment*. If transportation to a hospital is requested by an employee who is injured during the course of employment, the railroad shall promptly arrange to have the injured employee transported to the nearest hospital where the employee can receive safe and appropriate medical care.

**(2) Discipline.**--A railroad carrier or person covered under this section may not discipline, or threaten discipline to, an employee for requesting medical or first aid treatment, or *for following orders or a treatment plan of a treating physician*, except that a railroad carrier's refusal to permit an employee to return to work following medical treatment shall not be considered a violation of this section if the refusal is pursuant to Federal Railroad Administration medical standards for fitness of duty or, if there are no pertinent Federal Railroad Administration standards, a carrier's medical standards for fitness for duty. For purposes of this paragraph, the term "discipline" means to bring charges against a person in a disciplinary proceeding, suspend, terminate, place on probation, or make note of reprimand on an employee's record.

49 U.S.C. § 20109(c) (emphasis added).  We are the first federal appeals court to consider a case involving this subsection.[5]

We are confronted here with a statute that specifically references at subsection (c)(1) "injur[ies] during the course of employment," while subsection (c)(2) does not.  PATH argues that the "treatment" in subsection (c)(2) "refers back" to the "treatment" in subsection (c)(1) and thereby incorporates the "during the course of employment" limitation into subsection (c)(2).[6]

---

[5] We have previously encountered § 20109 in *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152 (3d Cir. 2013).  There we held that there was enough evidence supporting the plaintiff's retaliation claim for reporting a work-related injury under subsection (a)—a provision not directly implicated in this case—such that summary judgment should not have been granted in favor of the defendant railroad.

[6] This is, at the very least, a permissible theory of statutory construction.  *See, e.g.*, *United States v. Navajo Nation*, 556 U.S. 287, 299 (2009) ("The 'program' twice mentioned in § 638 refers back to the Act's opening provision . . . § 631."); *Melkonyan v. Sullivan*, 501 U.S. 89, 94 (1991) ("The requirement [in (d)(1)(B)] that the fee application be filed within 30 days of 'final judgment *in the action*' plainly refers back to the 'civil action ... in any court' in (d)(1)(A).").

The DOL, contending that the two paragraphs are "distinct" provisions, argues that the absence of the "during the course of employment" limitation in subsection (c)(2) reflects a deliberate choice by Congress to extend protections even to workers who sustain injuries off-duty. Since, under subsection (c)(2), a physician's order could include a direction that an employee not work (as the physician's order did in this case), and because there is no temporal limitation in the statute, the DOL's interpretation would functionally confer indefinite sick leave on all railroad employees who can obtain a physician's note.[7]

We agree with PATH that the "during the course of employment" limitation applies to subsection (c)(2). As we explain below, because subsection (c)(2) is an anti-retaliation provision obviously related to subsection

---

[7] The fact that railroads may still be able to discipline employees who take sick leave in bad faith as well as those who take excessive *unprotected* absences, does not negate the existence of indefinite sick leave for potentially appreciable numbers of railroad employees. Nor does the safe-harbor provision in subsection (c)(2), which allows an employer to refuse to permit an employee to return to work if s/he does not meet applicable medical standards. That refusal is permissible only until the employee meets those standards, at which point s/he is entitled to return to work.

(c)(1), it should *presumptively* be interpreted only to further the objectives of subsection (c)(1). The DOL's broad interpretation of subsection (c)(2) would not further the objectives of subsection (c)(1), and the DOL is unable to rebut the aforementioned presumption. The ARB, relying on *Russello v. United States*, 464 U.S. 16, 23 (1983), concluded that the absence of any express on-duty limitation in subsection (c)(2), in contrast to the presence of such a limitation in subsection (c)(1), means that Congress did not intend for that limitation to apply to subsection (c)(2). But, for reasons we explain below, *Russello* is unhelpful here.

Moreover, further examination of the statutory text affirmatively supports the conclusion that subsection (c)(2) is limited to addressing on-duty injuries. We do recognize that the DOL advances a logical policy argument in support of its position: that railroad safety could be threatened if injured workers are pressured to return to work by the absence of indefinite sick leave. But there is no evidence Congress ever considered that reason, and simultaneously-enacted provisions suggest that Congress would have written subsection (c)(2) differently if that were its intent.

## A.

Subsection (c)(1), entitled "Prohibition," is a "substantive provision;" while subsection (c)(2), entitled "Discipline," is an "antiretaliation provision."

13

*See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61-62 (2006) (analyzing the relationship between §§ 703 and 704 of Title VII). Generally, an "antiretaliation provision seeks to secure [the] primary objective" advanced by the substantive provision. *Id.* at 63. *Cf. Dellinger v. Sci. Applications Int'l Corp.*, 649 F.3d 226, 230 (4th Cir. 2011) ("The anti-retaliation provision is included [in the Fair Labor Standards Act], not as a free-standing protection . . . but rather as an effort 'to foster a climate in which compliance with the substantive provisions of the [Act] would be enhanced.'") (quoting *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 293 (1960)).

The plain text of subsection (c)(1), which covers an "employee who is injured during the course of employment," makes clear that its primary objective is to ensure that railroad employees are able to obtain medical attention for injuries sustained on-duty. Subsection (c)(2) furthers that objective by encouraging employees to take advantage of the medical attention protected by subsection (c)(1), without facing reprisal. Interpreting subsection (c)(2) to also cover off-duty injuries would not further the purposes of subsection (c)(1), which is explicitly limited to on-duty injuries.

We think this much is beyond reasonable debate. Although the DOL contends that the provisions are "distinct," it does not contest the fact that subsection

14

(c)(2) effectuates the purposes of subsection (c)(1). Nor does the DOL contest the fact that its broad interpretation of subsection (c)(2) would not further the purposes of subsection (c)(1)—indeed the DOL emphasizes that subsection (c)(2)'s protection for following the "orders or a treatment plan of a treating physician" is "a *distinct protection* only appearing in subsection (c)(2)." Respondent's Br. at 21 (emphasis added). So, the real issue becomes the extent to which—despite their obvious relationship—subsection (c)(2) is a multi-purpose provision intended by Congress to also advance an objective that is independent from those advanced in subsection (c)(1). Consistent with the construction of anti-retaliation provisions in general, and in particular anti-retaliation provisions immediately following a related substantive provision (as in *Burlington* and here), we presume that Congress did not intend subsection (c)(2) to be a vehicle for advancing an independent objective.[8]

---

[8] *See Dellinger*, 649 F.3d at 235 (King, J., dissenting) (characterizing the majority's approach as a "presum[ption]"). Of course, we would not allow considerations of the purpose of an anti-retaliation provision to trump the statute's text. For example, we recently rejected a rather plausible argument that a whistleblower provision would be undermined, in favor of "Congress's intent [as] clearly reflected in the text and

15

**B.**

As "[t]he best evidence of the purpose of a statute is the statutory text adopted by both Houses of Congress," *Wyeth v. Levine*, 555 U.S. 555, 599 (2009) (Thomas, J., concurring in the judgment) (internal brackets omitted) (quoting *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991)), we begin our search for evidence that Congress actually intended subsection (c)(2) to advance an independent objective by examining the textual analysis in the ARB's decision below. That analysis focused on an extension of the Supreme Court's decision in *Russello*. "[*Russello*] set[s] out [a canon of interpretation] that 'where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate

---

structure of [the Act]." *Khazin v. TD Ameritrade Holding Corp.*, No. 14-1689, 2014 WL 6871393, at *4 (3d Cir. Dec. 8, 2014); *see also Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 568-69 (3d Cir. 2002) (resolving a conflict between "the overall purpose of the anti-retaliation provisions" and their "plain text" in favor of the plain text); *but cf. Brock v. Richardson*, 812 F.2d 121, 124 (3d Cir. 1987) ("It follows that courts interpreting the anti-retaliation provision have looked to its animating spirit in applying it to activities that might not have been explicitly covered by the language.").

inclusion or exclusion.'" *Kapral v. United States*, 166 F.3d 565, 578 (3d Cir. 1999) (Alito, J., concurring) (quoting *Russello*, 464 U.S. at 23) (internal brackets omitted). Because subsection (c)(1) is explicitly limited to "injur[ies] during the course of employment" and subsection (c)(2) is not, applying *Russello*, the ARB concluded that Congress clearly intended subsection (c)(2) to apply without such limitation.[9] We disagree.

At issue in *Russello* was a Racketeer Influenced and Corrupt Organizations ("RICO") forfeiture provision, 18 U.S.C. § 1963(a)(1), which extended to "any interest [the person] has acquired or maintained in violation of [the RICO statute]." The petitioner argued that one can only have an "interest" in something, and that per the language of subsection (a)(1) that interest must be an interest in the enterprise itself (and not in money or profits derived therefrom). The Supreme Court

---

[9] The ARB's insistence in this regard is puzzling. After all, not only did it reject the conclusion it now advances in *Santiago*, it also: (i) rejected an ALJ's application of *Russello* to interpret the relationship between subsections (c)(1) and (c)(2); (ii) observed the "parallel structure" of subsections (a), (b) and (c); and (iii) discussed inferring statutory references from context—all methodological approaches it abandoned below in order to reach its contrary conclusion. *See Santiago*, 2012 WL 3164360, at *5-7, 10.

17

rejected that analysis on its face, and then stated: "[w]e are fortified in this conclusion by our examination of the structure of the RICO statute." 464 U.S. at 22. Unlike subsection (a)(1), subsection (a)(2) extended only to interests "in . . . any enterprise" which were connected to a person's RICO violation. Thus, the Supreme Court concluded that if Congress wanted to restrict subsection (a)(1) to only interests in enterprises, it would have done so explicitly as it did in subsection (a)(2).

We acknowledge a similarity between this case and *Russello*—but that similarity is superficial. The *Russello* presumption only applies when two provisions are sufficiently distinct that they do not—either explicitly or implicitly—incorporate language from the other provision. *See Clay v. United States*, 537 U.S. 522, 530 (2003) ("in *Russello* . . . [t]he qualifying words 'in . . . any enterprise' narrowed § 1963(a)(2), *but in no way affected* § 1963(a)(1)" (emphasis added; second omission in original)). Since the critical question here is *whether* subsection (c)(1) operates to cabin the scope of subsection (c)(2), *Russello* can only be meaningfully invoked after we resolve that inquiry.[10] Consequently, it is of little help here.[11]

---

[10] Holding otherwise, as the ARB did, would seem to foreclose the possibility that a statute could reference another provision without expressly saying so. That, of

18

Moreover, the *Russello* presumption is based on "[s]tatutory context," *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 728 (6th Cir. 2013), and "a hypothesis of careful draftsmanship." *Kapral*, 166 F.3d at 579 (Alito, J., concurring).  But that hypothesis is at least partially eroded by numerous examples of inexact drafting in § 20109.  *See City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435-36 (2002) (not following the *Russello* presumption, in part because of perceived drafting inconsistencies).  For example, faced with stronger arguments from the plain text of the statute than the DOL advances here, other federal courts have rejected railroads' contentions that: (i) employees have no remedy if they fail to receive the

course, is contrary to Supreme Court precedent.  *See supra* n.6.

[11] We do note that the Supreme Court invoked *Russello* in *Burlington*, while analyzing how an anti-retaliation provision interacted with its accompanying substantive provision.  *See* 548 U.S. at 63.  But the Court was not confronted with an argument (plausible or otherwise) that the two sections actually referred to each other, as we are here.  Moreover, the Supreme Court invoked *Russello* to *support* its conclusion that the anti-retaliation provision was meant to further the objectives of the substantive provision.  By contrast, here the DOL invokes *Russello* to drive a wedge between the two provisions.

19

medical treatment subsection (c)(1) entitles them to;[12] and (ii) railroads may bring disciplinary charges against employees who report accidents and safety violations.[13]

## C.

The basis for rejecting the DOL's interpretation is not merely a presumption against it and the unpersuasiveness of the DOL's textual arguments. Rather, a close examination of the statutory text affirmatively supports the conclusion that subsection (c)(2) is limited to addressing on-duty injuries. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 131

---

[12] *Delgado v. Union Pac. R. Co.*, No. 12 C 2596, 2012 WL 4854588, at *2-4 (N.D. Ill. Oct. 11, 2012) (rejecting the argument that there is no private right of action for a violation of subsection (c)(1)'s "deny, delay, or interfere" prohibition, because subsection (d)(1) creates only private rights of action for "discharge, discipline, or other discrimination").

[13] *Conrad v. CSX Transp., Inc.*, No. 13-3730, 2014 WL 5293704, at *2-3 (D. Md. Oct. 14, 2014), (rejecting the argument that because bringing disciplinary charges was expressly defined as "discipline" for purposes of subsection (c), while not explicitly mentioned as a form of "discriminat[ion]" prohibited by subsections (a) and (b), that bringing such charges was not prohibited under subsections (a) and (b)), *vacated and issue rendered moot*, 2014 WL 7184747 (D. Md. Dec. 15, 2014).

S. Ct. 1325, 1330-31 (2011) ("interpretation of [a] phrase [in an anti-retaliation provision] 'depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.'") (quoting *Dolan v. Postal Service*, 546 U.S. 481, 486 (2006)). Subsection (c) has two different segments (subsections (c)(1) and (c)(2)) which each provide similar protections to employees. Moreover, one segment is expressly limited to matters work-related, while the other has no such explicit limitation. Strikingly, the same is also true of subsection (b), making for an illuminating comparison:

**(b) Hazardous safety or security conditions.—**

(1) A railroad carrier engaged in interstate or foreign commerce, or an officer or employee of such a railroad carrier, shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for—

(A) reporting, in good faith, *a hazardous safety or security condition*;

(B) refusing to work when confronted by *a hazardous safety or security condition related to the performance of the employee's duties* . . .

21

49 U.S.C. § 20109(b) (emphasis added).

The DOL contends, consistent with its approach to interpreting subsection (c)(2), that because there is no express qualification in subsection (b)(1)(A), an employee is protected for reporting *any* "hazardous safety or security condition." At oral argument the DOL was presented with a *reductio ad absurdum*: a PATH employee, wearing a PATH sweatshirt, protests pollution at a power plant "entirely unrelated" to railroads, his conduct at that protest impugns PATH's reputation (since he was wearing a PATH sweatshirt), and PATH disciplines him as a result. The DOL, remaining consistent, responded that such discipline would violate subsection (b)(1)(A). We cannot agree.

"[I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish." *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 454-55 (1989) (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (Hand, J.)). The purpose of the entirety of the FRSA is as obvious as it is express: "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Accordingly, we think that subsection (b)(1)(A) must be read as having at least some work-related limitation, even though no such limitation appears on the face of the

22

statute. And if a work-related limitation must be applied to subsection (b)(1)(A), it would be consistent to also apply a work-related limitation to subsection (c)(2).

Subsection (c)(2) itself also supports the conclusion that an on-duty limitation applies therein. Although not the portion directly at issue here, subsection (c)(2) protects employees who "*request*[] medical or first aid treatment." (emphasis added). It seems unlikely that Congress was concerned about railroads disciplining employees for requesting medical treatment for off-duty injuries.[14] Indeed, at oral argument, the DOL conceded that such a scenario was "unlikely as a practical matter" and could not articulate even a hypothetical situation where an employee would be disciplined for requesting medical treatment for an off-duty injury.[15] If Congress

---

[14] Subsection (c)(2)'s title of "Prompt medical attention" also suggests an on-duty limitation, as it is difficult to imagine how railroads could be responsible for ensuring that employees who are injured off-duty receive prompt medical attention. *Cf. I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) ("The text's generic reference to 'employment' should be read as a reference to the '*unauthorized* employment' identified in the paragraph's title.").

[15] The DOL's able counsel did suggest that an employee who is injured away from work, makes an appointment to consult with his physician about that injury but cannot

likely did not consider the application of the phrase "requesting medical or first aid treatment" in subsection (c)(2) to off-duty injuries, it is unlikely that Congress would have shifted course mid-sentence (without any textual indication) to have the phrase "orders or a treatment plan of a treating physician" apply to off-duty injuries.

**D.**

Although lacking in textual support, the DOL does provide a logical policy basis for how a broad interpretation of subsection (c)(2) would advance railroad safety. The DOL argues that if subsection (c)(2) does not cover off-work injuries, employees may be "forc[ed] . . . to choose between violating employer attendance policies and compromising railroad safety by working while injured." Respondent's Br. at 11. Indeed, certain railroad employees "are engaged in [such] safety-sensitive tasks," that the Supreme Court has compared the safety implications of their performance to those "who have routine access to dangerous nuclear power facilities." *Skinner v. Ry. Labor Exec. Ass'n*, 489 U.S.

work between the time the appointment is scheduled and the appointment itself, might be disciplined. However, the employee's inability to work would not be *because* of the request for medical treatment but rather *in spite* of such request.

24

602, 628 (1989) (finding a compelling interest in subjecting such employees to suspicionless drug testing).

In passing the RSIA, Congress was clearly concerned about the safety implications of how employees perform their duties. *See, e.g.*, 49 U.S.C. § 20156 (requiring a "fatigue management plan" to be included as part of railroads' risk reduction programs); 49 U.S.C. § 20162 (requiring the Secretary of Transportation to establish "minimum training standards"); RSIA § 405 (requiring the Secretary of Transportation to study the safety impact of the use of cell phones and other potentially distracting electronic devices). But all of these employee safety provisions are expressly limited to "safety-related railroad employees"—a term of art under the FRSA.[16] These

---

[16] 49 U.S.C. § 20102(4) provides: "'safety-related railroad employee' means--
(A) a railroad employee who is subject to [hours of service restrictions under] chapter 211; (B) another operating railroad employee who is not subject to chapter 211; (C) an employee who maintains the right of way of a railroad; (D) an employee of a railroad carrier who is a hazmat employee as defined in section 5102(3) of this title; (E) an employee who inspects, repairs, or maintains locomotives, passenger cars, or freight cars; and (F) any other employee of a railroad carrier who directly affects railroad safety, as determined by the Secretary."

25

provisions build on the longstanding commonsense recognition that only certain categories of railroad employees pose unique dangers if they work while impaired.[17] Strikingly, subsection (c)(2) contains no such limitation, which means it may extend even to railroad accountants. Had Congress intended to provide sick leave to workers in safety-sensitive positions in order to combat potential impairment, it likely would have placed a limit in subsection (c)(2) to that effect as it has regularly done when concerned about impaired railroad employees.

---

[17] The Hours of Service Act of 1907, 34 Stat. 1415 (March 4, 1907), limited the number of hours railroad employees could work, *if* they were "actually engaged in or connected with the movement of any train" and/or were an "operator, train dispatcher, or other employee who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements." The modern codification, 49 U.S.C. §§ 21101 – 21109 ("chapter 211"), is expressly incorporated as a basis for determining who is a "safety-related employee," under the FRSA. *See supra* n.16. The drug tests at issue in *Skinner* were also limited to these types of employees. *Skinner*, 489 U.S. at 608 ("[t]he final regulations apply to employees assigned to perform service subject to the Hours of Service Act, ch. 2939, 34 Stat. 1415, as amended . . . .").

26

The alternative is that Congress meant to provide sick leave to all railroad employees. Providing an entire industry's workers a right to unlimited sick leave is a substantial policy undertaking, and we are unaware of any other federal laws conferring such a right on workers in any industry.[18] Rather, the default rule under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, is that workers (regardless of industry) are provided with up to 12 weeks of sick leave every 12 months. 29 U.S.C. § 2612(a)(1). "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). We are not prepared to assume that Congress decided to enact such a

---

[18] The DOL inaptly draws our attention to 49 U.S.C. § 31105(a)(1)(B)—an anti-retaliation provision in the Surface Transportation Assistance Act—which is actually similar to § 20109(a)(2). They each provide protections to transportation employees who refuse to violate safety-related laws or regulations. While Department of Transportation regulations prohibit commercial drivers from operating a vehicle while "so impaired, or so likely to become impaired . . . as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle," 49 C.F.R. § 392.3, the DOL's interpretation of § 20109(c)(2) would give workers leave *regardless* of whether safety is implicated.

significant change by inserting an eleven-word sentence fragment between much more limited protections, from which such a change could be *deduced.* "[I]t is highly unlikely that Congress . . . [made] a decision of such economic and political significance . . . in so cryptic a fashion." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (internal quotations and citations omitted).

**E.**

The DOL further suggests that the RSIA's legislative history supports its position. Although, in light of the foregoing analysis, "resort to the legislative history is . . . unnecessary to decide this case, our inquiry in that regard discloses no support for [the DOL]'s position." *In re Pelkowski*, 990 F.2d 737, 742 (3d Cir. 1993). Subsection (c) was modeled on two similar state statutes which were held preempted by federal law in 2007.[19] Like subsection (c)(2), both statutes were broken

---

[19] *See* 610 Ill. Comp. Stat. 107/10, *held preempted in BNSF Ry. Co. v. Box*, 470 F. Supp. 2d 855 (C.D. Ill. 2007); Minn. Stat. § 609.849, *held partially preempted in BNSF Ry. Co. v. Swanson*, No. 06-1013, 2007 WL 1994042 (D. Minn. July 3, 2007) *rev'd and held fully preempted*, 533 F.3d 618 (8th Cir. 2008); *The Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads: Hearings Before the H.*

28

into two paragraphs: a "deny, delay or interfere" paragraph, followed by a "discipline" paragraph. In both state statutes, both paragraphs contained an "injured during the course of employment" limitation. By contrast, in the federal version, only subsection (c)(1) has such a limitation. The DOL, echoing its earlier arguments, contends that this is evidence of a deliberate choice by Congress.[20]

However, the DOL concedes that both of the state statutes and the federal hearings before the adoption of subsection (c) were focused on work-related injuries, and it has been unable to point to any express evidence that the policy it now advances was ever considered by

_____

*Comm. on Transportation and Infrastructure*, 110th Cong. (Oct. 25, 2007).

[20] The DOL also points out that the initial House and Senate versions of what became subsection (c) were structured differently. *Compare* H.R. 2095, 110th Cong. (Oct. 17, 2007) at 68-69 (§ 606) *with* S. 1889, 110th Cong. (Mar. 3, 2008) at 183 (§ 411). However, we do not find this difference illuminating, and are not prepared to alter our conclusion regarding the statute's meaning after "consideration of the Government's highly speculative suggestions as to the meaning of the legislative history." *United States v. Zucca*, 351 U.S. 91, 94-95 (1956). *See also Martin v. Hadix*, 527 U.S. 343, 357 (1999).

29

anybody at any point in the legislative process. Rather, because of the "broader safety purposes behind the statute," the DOL asks us simply to assume that Congress would have wanted this result. Aside from the separation of powers issues raised by that proposition, how do we know that Congress would not have been more concerned about potential safety issues *caused* by absenteeism, thus outweighing the potential benefits of the DOL's stance? We don't—which is one reason why this Court does not formulate public policy.

## F.

The DOL argues that even if we do not agree that the statute necessarily extends to off-duty injuries, the ARB's interpretation is entitled to *Chevron* deference. But whether two different statutory provisions have the same scope "is a pure question of statutory construction for the courts to decide," which warrants "[e]mploying traditional tools of statutory construction." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987). "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n.9. Only "if . . . the court determines Congress has not directly addressed the precise question at issue," does the question become "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

30

Employing traditional tools of statutory construction,[21] we have concluded that subsection (c)(2) applies only to on-duty injuries.  Accordingly, the ARB is not entitled to *Chevron* deference.[22]

## IV.

Having concluded that the Administrative Review Board misinterpreted the statute, we will grant the petition challenging the Board's September 27, 2013 order, and remand with instructions that the proceeding against Petitioner be dismissed.

---

[21] *See City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1876 (2013) (Breyer, J., concurring) (Such traditional tools include "the statute's text, its context, the structure of the statutory scheme, and canons of textual construction[, which] are relevant in determining whether the statute is ambiguous . . . .").

[22] We need not consider the separate argument that the ARB is not entitled to *Chevron* deference because rulemaking authority for the statute at issue has been delegated to the Secretary of Transportation.  *See* 49 U.S.C. § 20103(a).  Nor need we consider the additional separate arguments that the unacknowledged inconsistencies between the decision below and *Santiago* undermine the ARB's claim to *Chevron* deference and/or renders its decision arbitrary and capricious under the Administrative Procedure Act.