RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0026p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NORFOLK SOUTHERN RAILWAY COMPANY,

> *Petitioner,*

*v.*

THOMAS E. PEREZ, Secretary of Labor,

> *Respondent.*

No. 14-3274

On Petition for Review from the Final Decision and Order of
the United States Department of Labor's Administrative Review Board.
No. 12-106;12-081.

Argued:  December 4, 2014

Decided and Filed:  February 18, 2015

Before:  COLE, Chief Judge; GRIFFIN, Circuit Judge; CARR, District Judge.[*]

_____

## COUNSEL

**ARGUED:**    Robert  E.  Harrington,  III,  HARRINGTON,  THOMPSON,  ACKER  &
HARRINGTON,  LTD.,  Chicago,  Illinois,  for  Intervenor.    John  B.  Lewis,  BAKER  &
HOSTETLER LLP, Cleveland, Ohio, for Petitioner.   Rachel Goldberg, UNITED STATES
DEPARTMENT OF LABOR, Washington, D.C., for Respondent.  **ON BRIEF:**  Robert E.
Harrington, III, HARRINGTON, THOMPSON, ACKER & HARRINGTON, LTD., Chicago,
Illinois, for Intervenor.   John B. Lewis, Dustin M. Dow, BAKER & HOSTETLER LLP,
Cleveland, Ohio, for Petitioner.   Rachel Goldberg, UNITED STATES DEPARTMENT OF
LABOR, Washington, D.C., for Respondent.  Harry W. Zanville, San Diego, California, for
Amicus Curiae.

_____

[*]The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by
designation.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.    The Federal Railroad Safety Act (the "FRSA"), which prohibits a railroad carrier from retaliating against employees who report work-related injuries and potential safety violations, provides that "[a]n employee may not seek protection under both this section and another provision of law for the same allegedly unlawful act of the railroad carrier."  49 U.S.C. § 20109(f).  This case presents the question whether § 20109(f) precludes a railroad employee from filing an FRSA claim with respect to an adverse employment decision if he has already claimed that the employment decision violated his collective bargaining agreement and has arbitrated that dispute under the provisions of the Railway Labor Act (the "RLA").  We conclude that it does not and therefore deny Norfolk Southern's petition for review.

I.

To give context to the parties' arguments, we begin with the relevant statutory background.

In the mid-1920s, Congress realized that labor disputes between railroad employee unions and railroad carriers had the potential to cripple interstate commerce by bringing the railroad industry to a standstill.  *See Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment*, 558 U.S. 67, 72 (2009); *Bhd. of Locomotive Eng'rs v. Baltimore & Ohio R.R. Co.*, 372 U.S. 284, 290 (1963).  In an attempt to diminish the likelihood of strikes and to "encourage use of the nonjudicial processes of negotiation, mediation and arbitration for the adjustment of labor disputes," Congress passed the Railway Labor Act in 1926. *Bhd. of R.R. Trainmen, Enter. Lodge, No. 27 v. Toledo, P. & W. R.R.*, 321 U.S. 50, 58 (1944).  Under the original version of the RLA, the parties were encouraged—but not required— to submit "minor disputes" (that is, "grievances arising from the application of collective bargaining agreements to particular situations" as opposed to disputes over the formation of

collective bargaining agreements) to voluntary arbitration.  *Union Pac. R.R. Co.*, 558 U.S. at 72 (citation omitted).

But the original version of the RLA was largely ineffectual.  Many of the railroads refused to participate in voluntary arbitration, and even arbitrated disputes frequently deadlocked, given that management and labor representatives were equally represented on the arbitration boards.  *See Union Pac. R.R. Co. v. Price*, 360 U.S. 601, 610 (1959).

Dissatisfied with the voluntary nature of arbitration under the RLA, railroad labor organizations urged Congress to amend it by mandating arbitration of "minor disputes" before either the National Railroad Adjustment Board or an otherwise agreed-upon arbitration board, each of which would be composed of equal representatives from management and labor, supplemented by neutral tie-breakers.  *Id.* at 611–12; *see also* 45 U.S.C. § 153 Second.  As a concession for forcing the railroad carriers into arbitration, railroad employees agreed that "[arbitration] awards on grievances submitted by or on behalf of employees were to be final and binding upon the affected employees.  The employees were willing to give up their remedies outside of the statute provided that a workable and binding statutory scheme was established to settle grievances."  *Price*, 360 U.S. at 613.

In 1934, Congress amended the RLA consistent with the unions' request, thereby mandating arbitration of grievances and "barr[ing] the employee's subsequent resort to the common-law remedy after an adverse determination of his grievance by the Adjustment Board."  *Id.* at 608–09.  *See* 45 U.S.C. § 153 First (i); *Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 322 (1972).  The pertinent provisions of the RLA have remained intact to this day.  Thus, a railroad employee may pursue a grievance under his collective bargaining agreement only pursuant to the scheme of arbitration mandated by the RLA, and—except in extremely narrow circumstances[1]—may not seek judicial review of the outcome in any court.  *Price*, 360 U.S. at 617; *see Bhd. of Locomotive Eng'rs & Trainmen v. United Transp. Union*, 700 F.3d 891, 899–902 (6th Cir. 2012).

---

[1]In 1966, the RLA was amended to permit parties to challenge adverse arbitration awards in the very narrow circumstances that the Board lacked jurisdiction or that the Board's decision was beset by fraud or corruption.  *See* 45 U.S.C. § 153 First (q); *Union Pac. R.R. Co.*, 558 U.S. at 75.

At the same time that it was working to achieve nondisruptive resolution of labor disputes, Congress was leveraging its commerce power to address another issue related to the railroad industry: railroad safety. According to contemporary sources, one of the quickest ways to get killed in the late nineteenth century was to start working for a railroad. "In 1888 the odds against a railroad brakeman's dying a natural death were almost four to one," and a railroad switchman could be expected to die, on average, after only seven years on the job. *Bhd. of R.R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 3 (1964). In response to the railroads' substantial human toll, Congress began enacting legislation requiring that the industry comply with improved, minimal safety standards. *See, e.g.*, *Wilkerson v. McCarthy*, 336 U.S. 53, 68 (1949) (Douglas, J., concurring) (noting purpose of Federal Employers' Liability Act); *Johnson v. S. Pac. Co.*, 196 U.S. 1, 19 (1904) (noting laws requiring safer methods of railway car coupling); *cf. Norfolk & W. Ry. Co. v. Hiles*, 516 U.S. 400, 406 (1996); *Ries v. Nat'l R.R. Passenger Corp.*, 960 F.2d 1156, 1158 (3d Cir. 1992).

Congress continued in this vein when it enacted the Federal Railroad Safety Act in 1970, a statutory scheme intended to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 347 (2000) (quoting 49 U.S.C. § 20101). Although the original version of the FRSA did not prohibit railroad carriers from retaliating against employees who alerted authorities about a violation of federal safety regulations, Congress amended the Act in 1980 to include an anti-retaliation provision. *See* Federal Railroad Safety Authorization Act of 1980, Pub. L. 96–423, § 10, 94 Stat. 1811 (1980); *Rayner v. Smirl*, 873 F.2d 60, 63 (4th Cir. 1989).

But the anti-retaliation provision came with a catch: it contained an election-of-remedies provision that required an employee seeking protection "under any other provision of law in connection with the same allegedly unlawful act of an employer" to choose "either to seek relief pursuant to this section [*i.e.*, the FRSA] or pursuant to such other provision of law." Pub. L. 96–423, § 10, sec. 212(d). According to the member of Congress who managed the bill in the House of Representatives, the election-of-remedies provision was intended to

> clarify[] the relationship between the remedy provided here and a possible separate remedy under OSHA. Certain railroad employees, such as employees working in shops, could qualify for both the new remedy provided in this

legislation, or an existing remedy under OSHA. It is our intention that pursuit of one remedy should bar the other, so as to avoid resort to two separate remedies, which would only result in unneeded litigation and inconsistent results.

126 Cong. Rec. 26532 (Sept. 22, 1980) (statement of Rep. Florio).

Under the 1980 version of the statute, employees who sought to bring an FRSA retaliation claim were required to do so pursuant to the mandatory arbitration procedure established under the Railway Labor Act. *See* Pub. L. 96–423, § 10, sec. 212(c)(1); Procedures for the Handling of Retaliation Complaints Under the National Transit Systems Security Act and the Federal Railroad Safety Act, 75 Fed. Reg. 53,522, 53,523 (Aug. 31, 2010); *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 156 (3d Cir. 2013). Thus, an FRSA claim, like a workplace grievance, was adjudicated by an arbitration board under the RLA.

Following the 9/11 Commission Report, however, the FRSA was amended yet again. *See* Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110–53, § 1521, 121 Stat. 266, 444 (2007) (codified at 49 U.S.C. § 20109). Most significantly, the 2007 amendments permitted employees to file FRSA claims with the Secretary of Labor, rather than requiring them to proceed through the RLA arbitration process. *See* 49 U.S.C. § 20109(d).

Several other provisions were added to § 20109, as well. Among them was subsection (h), which now provides, "Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under any Federal or State law or under any collective bargaining agreement. The rights and remedies in this section may not be waived by any agreement, policy, form, or condition of employment." 49 U.S.C. § 20109(h).

According to the pertinent conference report, the 2007 FRSA amendments were intended to "expand[]" the protections for railroad employees, to "enhance[]" employees' "administrative and civil remedies," and "to ensure that employees can report their concerns without the fear of possible retaliation or discrimination from employers." H.R. Rep. No. 110-259, at 348 (2007) (Conf. Rep.); *Norfolk S. Ry. Co. v. Solis*, 915 F. Supp. 2d 32, 38 (D.D.C. 2013). Nevertheless, the 2007 amendments to the statute did not remove the preexisting election-of-remedies provision in § 20109(f), which purports to prohibit an employee from "seek[ing] protection

under both this section and another provision of law for the same allegedly unlawful act of the railroad carrier." *Id.*

## II.

The facts relevant to the parties' dispute in this case are not complicated. Marcus Kruse, a train conductor employed by Norfolk Southern, was injured on the job in March 2010, reported his injury, and took leave until August 2010. Shortly after he returned to work, Kruse was given a thirty-day suspension without pay for exceeding train speed limits. Kruse's union appealed the suspension on his behalf under section 3 of the Railway Labor Act, 45 U.S.C. § 153 First (i), claiming that the suspension violated Kruse's collective bargaining agreement inasmuch as it was not supported by good cause. Both the on-property investigation and the arbitration board (convened under § 153 Second) concluded that Norfolk Southern "was justified" in holding Kruse responsible for the train's speed, although the board mitigated Kruse's punishment by reducing his suspension to a thirty-day deferred suspension with pay for lost time.

While his grievance-related appeal was still pending before the arbitration board, Kruse filed an FRSA complaint with the Department of Labor, claiming that his suspension was in retaliation for reporting his prior work-related injury. A hearing was held before an administrative law judge ("ALJ"). Norfolk Southern moved for a summary decision on Kruse's claim, arguing that FRSA's election-of-remedies provision barred his claim, given that he had already challenged his suspension in arbitration. The ALJ denied Norfolk Southern's motion and ultimately found in favor of Kruse on the merits of his FRSA claim, holding that Norfolk Southern had suspended him in retaliation for reporting his workplace injury.

Norfolk Southern appealed to the Department of Labor's Administrative Review Board (the "Board"), challenging only the ALJ's election-of-remedies ruling. The Board affirmed the ALJ, citing its previous decision in *In re Mercier*, No. 09-121, 2011 WL 4889278 (ARB Sept. 19, 2011), which had held that an employee's prior arbitration of a grievance under the RLA did not trigger the FRSA's election-of-remedies provision. *See id.* at *5.

Norfolk Southern petitions for review of the Board's decision. *See* 49 U.S.C. § 20109(d)(4).

III.

The only issue contested by the parties is whether the Board erred in concluding that Kruse's FRSA claim was not barred by the FRSA's election-of-remedies provision. A petition for review of an order entered by the Board pursuant to the FRSA is governed by the Administrative Procedure Act, *see* 49 U.S.C. § 20109(d)(4), meaning that the Board's legal conclusions are reviewed de novo. *See* 5 U.S.C. § 706 ("[T]he reviewing court shall decide all relevant questions of law."); *Consol. Rail Corp. v. U.S. Dep't of Labor*, 567 F. App'x 334, 338 (6th Cir. 2014).

Norfolk Southern argues that arbitration under the RLA is encompassed within the plain meaning of § 20109(f)'s directive that no employee shall "seek protection under both this section and another provision of law for the same allegedly unlawful act of the railroad carrier." If the statutory language is unambiguous—either in favor of Norfolk Southern or against it—then there is no need for us to engage in any *Chevron* analysis, as Congress could not have intended for an agency's policy expertise to give definition to a gray area if Congress did not leave the area gray. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984); *see also Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2445 (2014). Although the parties muddy the waters by relying on previous versions of § 20109(f) in an attempt to determine what the current wording of the statute means, "[t]he starting point in discerning congressional intent is the existing statutory text, and not the predecessor statutes." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (internal citation omitted).

We agree with the Secretary that the plain language of § 20109(f) defeats Norfolk Southern's position. Notably, however, Norfolk Southern is correct about at least one portion of the analysis: there is no question both that the RLA is "another provision of law" and that a collective bargaining agreement is not. The terms of a statute must be interpreted "as taking their ordinary, contemporary, common meaning," *Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 876 (2014) (citation omitted), and it is beyond dispute that a federal statute ordinarily is a "provision of law" whereas a private contract is not. The parties' long discussions regarding judicial glosses of phrases like "all other law" as used in different statutes are irrelevant to the meaning of the much narrower "provision of law" language used in the FRSA. *See, e.g., Norfolk*

& *W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 120 (1991) (construing the meaning of the phrase "all other law").

Given that the RLA clearly is a "provision of law," the parties' extended duel over whether the RLA is the precise type of legal provision envisioned by § 20109(f) is somewhat off the mark. Instead, as the Seventh Circuit recognized when deciding the same election-of-remedies issue, the operative question is not whether the RLA is a "provision of law" within the meaning of § 20109(f) but is instead whether Kruse sought "protection" under the RLA when he arbitrated his grievance against Norfolk Southern regarding his suspension. *See Reed v. Norfolk S. Ry. Co.*, 740 F.3d 420, 423 (7th Cir. 2014). Of course, as the Seventh Circuit also observed, these considerations are interrelated. *See id.* at 423 n.2. In other words, the Secretary's argument that the RLA is not "another provision of law" within the meaning of § 20109(f) amounts to an argument that the RLA is not the type of law that one can "seek protection" under. In the Secretary's view, the RLA establishes only a procedural framework that can be used in order to seek protection under something else—namely, a collective bargaining agreement.

Although we do not doubt that the arbitration procedures mandated by the RLA provide railroad carriers and employees with significant substantive benefits, we agree with the Secretary that the FRSA's election-of-remedies provision does not reach employees in Kruse's circumstances. A railroad employee does not "seek protection" under the RLA within the plain meaning of § 20109(f) by invoking RLA-mandated arbitration when pursuing a grievance under a collective bargaining agreement.

We must presume that Congress says what it means and means what it says, *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992), and therefore must apply a statute as it is written, giving its terms the ordinary meaning that they carried when the statute was enacted. *Sandifer*, 134 S. Ct. at 876. Generally, to "protect" means "to defend or guard from attack [or] loss . . . ," to "cover or shield from injury or danger," or to "screen [or] shelter." *Webster's Unabridged Dictionary of the English Language* 1553 (2d ed. 2001). To seek "protection," in turn, ordinarily means to seek "shelter, defen[s]e, or preservation from harm." *Oxford English Dictionary* 678 (2d ed. 1989).

Taking the terms of § 20109(f) at face value, we conclude that an employee "seeks protection" under a statute only if he seeks to use it as a shelter—that is, only if the statute is the source of the substantive remedy for the harm that the employee is attempting to avert. The rights guaranteed to the employee in the statute must be the barrier that is interposed between the employee and the threatened harm; it is not enough if the statute guarantees the employee only a procedural mechanism that enables him to shelter behind some other, independent legal bulwark.

Thus, an employee possibly could "seek protection" under the RLA if he sought to validate his right to arbitrate against a railroad carrier that did not want to participate in arbitration. In that scenario, the RLA's guarantee of mandatory arbitration would be the legal provision that prevents the harm that the employee is attempting to avoid. *See Reed*, 740 F.3d at 424. But where an employee seeks to validate rights located in a collective bargaining agreement, he is not seeking a remedy for a right that is guaranteed to him by the RLA. Certainly, he must leverage the RLA in order to obtain redress for the violation of the rights located in his collective bargaining agreement, but at that point he is not "seeking protection" under the RLA; he is simply availing himself of it. At bottom, it is the collective bargaining agreement—not the RLA—that is his shield.

Both the Fifth and Seventh Circuits have construed § 20109(f) in largely the same way, and we see no need to vary significantly from their approach. *See Grimes v. BNSF Ry. Co.*, 746 F.3d 184, 191 (5th Cir. 2014); *Reed*, 740 F.3d at 423. As *Reed* observed, such a reading fits harmoniously both with the remainder of § 20109(f) itself and within the context of the 2007 amendments, which added subsection (h)'s disclaimer that "[n]othing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under any Federal or State law or under any collective bargaining agreement." *See Reed*, 740 F.3d at 425–26. *See also Util. Air Regulatory Grp.*, 134 S. Ct. at 2441 ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (citation omitted)).

We recognize that, as Norfolk Southern strenuously contends, there is at least an argument to be made that the arbitral forum itself is one form of protection that the RLA provides to railroad employees. After all, railroad workers of yore specifically negotiated for a federal statute establishing a dispute-resolution process that would protect employees from the

inequitable vagaries of the preexisting voluntary arbitration regime. *Price*, 360 U.S. at 613; *United Transp. Union*, 700 F.3d at 899. *Cf. Hertz Corp. v. Friend*, 559 U.S. 77, 92 (2010) (noting in the diversity-jurisdiction context that the availability of a federal forum may provide substantive protections). Moreover, the RLA excludes all alternative methods of resolving workplace grievances, *see Union Pac. R. Co.*, 558 U.S. at 72, meaning that the RLA is "the law which gives legal and binding effect to collective agreements." *Dispatchers*, 499 U.S. at 132; *see also, Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 156 (1969). And because "[t]he processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement," *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 581 (1960), there is an argument to be made that Kruse sought at least some degree of "protection" under the RLA when he invoked the only available process that would construct the substantive meaning of his collective bargaining agreement.

But even if we accepted this line of reasoning and concluded that § 20109(f) applies by its plain terms to Kruse's claim, Norfolk Southern still could not surmount the barrier imposed by § 20109(h)'s subsequent addition to the statute. Subsection (h) precludes applying § 20109(f) to "diminish" an employee's rights under "any" law or "any" collective bargaining agreement. *Id.* But it seems quite clear that § 20109(f) dilutes an employee's rights whenever it is enforced. Restricting an employee to only one of the numerous arrows in his quiver obviously reduces the number of options available to him. Even more fundamentally, forcing an employee to choose either option A or option B dilutes the value of his rights under both options. The election-of-remedies provision imposes a cost upon an employee's decision to choose option A: he must forfeit option B. Thus, the value of option A is diluted in proportion to the cost imposed by the concomitant loss of option B. Under the election-of-remedies provision, in other words, even the option ultimately chosen by the employee is rendered less valuable to him by virtue of what he has given up in order to choose it.

Because the operation of subsection (f) is prohibited by subsection (h), § 20109 contains a linguistic contradiction. And despite Norfolk Southern's argument, multiple considerations point in favor of reading subsection (h) as trumping subsection (f), rather than vice versa. Even

Norfolk Southern admits that the Department of Labor's interpretation of the statute is entitled to be viewed as persuasive authority if not given *Chevron* deference. *See Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944); *Chao v. Occupational Safety & Health Review Comm'n*, 540 F.3d 519, 526 (6th Cir. 2008). And the Department's conclusion that "railroad employees [are] not . . . limited in pursuing their rights under the whistleblower statute [*i.e.*, the FRSA,] despite also enforcing their contractual rights in arbitration [*i.e.*, under the RLA]," aligns with the legislative history. *Mercier*, 2011 WL 4889278, at *7. No one doubts that Congress's intent in adding subsection (h) in 2007 was to expand employees' protections, and in doing so, it likely overrode subsection (f)'s purpose of barring "resort to two separate remedies." 126 Cong. Rec. 26532 (Sept. 22, 1980) (statement of Rep. Florio). Thus, we would have little trouble concluding that, where subsection (f) conflicts with subsection (h), the latter controls instead of the former. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007) (recognizing that the more recent of two statutes will control when they are in irreconcilable conflict). As a result, even assuming that Norfolk Southern's position was not defeated by the plain language of subsection (f), it still would be outflanked by subsection (h).

For purposes of this appeal, however, we need to proceed no further than the statute's plain language. Because Kruse did not seek protection under the RLA when he arbitrated his grievance, the arbitration did not trigger the FRSA's election-of-remedies provision in § 20109(f). The Board properly rejected Norfolk Southern's assertion otherwise.

IV.

For these reasons, we deny the petition for review.