RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0262p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

GRAND TRUNK WESTERN RAILROAD COMPANY,

*Petitioner*,

*v.*

UNITED STATES DEPARTMENT OF LABOR, ADMINISTRATIVE REVIEW BOARD,

*Respondent*,

WEBSTER WILLIAMS, JR.,

*Intervenor*.

No. 17-3083

───────────────

On Petition for Review from the United States
Department of Labor's Administrative Review Board.
Nos. ARB 14-092; ARB 15-008.

Argued: October 11, 2017

Decided and Filed: November 20, 2017

Before: KEITH, McKEAGUE, and STRANCH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Holly M. Robbins, LITTLER MENDELSON, P.C., Minneapolis, Minnesota, for Petitioner. Sarah Kay Marcus, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent. Robert B. Thompson, HARRINGTON, THOMPSON, ACKER & HARRINGTON, LTD., Chicago, Illinois, for Intervenor. **ON BRIEF:** Holly M. Robbins, Joseph D. Weiner, LITTLER MENDELSON, P.C., Minneapolis, Minnesota, for Petitioner. Sarah Kay Marcus, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent. Robert B. Thompson, Robert E. Harrington, III, HARRINGTON, THOMPSON, ACKER & HARRINGTON, LTD., Chicago, Illinois, for Intervenor. Harry W. Zanville, La Mesa, California, Jacqueline M. Holmes, JONES DAY, Washington, D.C., for Amici Curiae.

McKEAGUE, J., delivered the opinion of the court in which KEITH and STRANCH, JJ., joined. STRANCH, J. (pg. 14), delivered a separate concurring opinion.

---

**OPINION**

---

McKEAGUE, Circuit Judge.  Despite having had its position derailed by every federal court to date, the Department of Labor's Administrative Review Board steams ahead.  The Board interprets a retaliation clause in the Federal Railroad Safety Act (FRSA)—located in a recent amendment regarding "Prompt medical attention," 49 U.S.C. § 20109(c)—to provide sick leave to all railroad employees for *off-duty* injuries and illnesses.

In this case, the Board's broad interpretation meant Webster Williams, Jr.—a Grand Trunk employee with a non-work-related history of anxiety and depression—was granted relief from his termination for six collectively-bargained-for-as-unexcused absences because he was "following . . . a treatment plan of [his] treating physician."  49 U.S.C. § 20109(c)(2).

Traditional tools of statutory interpretation lead us to a different conclusion: subsection (c)(2), just like its preceding subsection (c)(1), applies only to *on-duty* injuries.  Thus, we grant the petition and remand with instructions that the proceeding below be dismissed.

**I**

Webster Williams, Jr. has a lifelong history of anxiety and depression.  This history pre-dates his employment with Grand Trunk Western Railroad Company (Grand Trunk), where Williams worked as a locomotive engineer from 1995 until his termination for excessive absences in 2012.

In 2006, Williams began seeing Dr. John Bernick for a variety of conditions, including hypertension, insomnia, anxiety, and depression.  As a part of his treatment plan, Dr. Bernick prescribed Xanax for Williams to take as a "stop gap" measure when Williams felt he needed to take the medication for his anxiety and depression.  But he did so with two additional instructions: first, he referred Williams to a psychiatrist for further treatment; second, he advised Williams that in addition to taking Xanax, he "shouldn't work" during an anxiety episode if he would not feel safe.  In December 2011, Williams missed eight days of work because of his

anxiety and depression. Although Williams's absences comported with at least part of Dr. Bernick's treatment plan for his medical conditions, Grand Trunk deemed six of these missed work days to be "unexcused absences" and terminated Williams in January 2012 for excessive absenteeism.[1]

On March 1, 2012, Williams filed a complaint with the Occupational Safety and Health Administration (OSHA) for wrongful retaliation and termination. On February 6, 2013, OSHA dismissed the complaint because Williams's absences for a "non-work-related illness" did not constitute qualifying "protected activity."

Williams appealed OSHA's dismissal to an administrative law judge (ALJ) on February 25, 2013. After an evidentiary hearing and a review of the parties' briefs, on August 11, 2014, the ALJ held that Williams had engaged in protected activity because he was following the treatment plan of his physician and the protected activity was a factor in Grand Trunk's decision to terminate Williams's employment. Thus, the ALJ awarded damages and attorney's fees to Williams. The ALJ based his finding that Williams's treatment plan was protected—even though it was for an off-duty illness—on the Administrative Review Board's holding in *Bala v. Port Authority Trans-Hudson Corp.*, No. 12-048, 2013 WL 5872050 (Admin. Rev. Bd. Sept. 27, 2013).[2] Grand Trunk appealed the ALJ's decision to the Board on August 21, 2014.

The Board affirmed the ALJ's decision in *Williams v. Grand Trunk W. R.R. Co.*, No. 2016 WL 7742872 (Admin. Rev. Bd. Dec. 5, 2016), and declined to apply the Third Circuit's decision in *Port Authority Trans-Hudson Corp. v. Sec'y, U.S. Dep't of Labor*, 776 F.3d 157, 161–62 (3d Cir. 2015) (*PATH*), which held that § 20109(c) only applies to treatment plans for on-duty injuries. This petition for review followed.

---

[1] Williams chose not to inform the company he was using FMLA leave on six of those days because he was afraid he had exhausted his FMLA leave. Therefore, because Williams's six unexcused absences over a seventeen-day period exceeded the work requirement threshold, Grand Trunk noticed a formal investigative hearing pursuant to the CBA on December 29, 2011.

[2] In *Bala*, the Board found that § 20109(c)(2) applied to treatment plans for both on and off-duty injuries.

**II**

"A petition for review of an order entered by the Board pursuant to the FRSA is governed by the Administrative Procedure Act." *Norfolk S. Ry. Co. v. Perez*, 778 F.3d 507, 511 (6th Cir. 2015) (citing 49 U.S.C. § 20109(d)(4)). The primary question this case presents is one of statutory interpretation. This is a question of law we review de novo. *Id.* at 511 ("[T]he Board's legal conclusions are reviewed de novo.").

Everyone agrees that the FRSA was amended in 2008 to provide railroad workers with additional protections for *on-duty* injuries. But does a retaliation provision in the FRSA—nested in a section providing for "Prompt medical attention," 49 U.S.C. § 20109(c)—encompass a physician's treatment plan for *off-duty* injuries? The Board argues it does; Grand Trunk argues it does not.

"We begin, as in any case of statutory interpretation, with the language of the statute." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 283 (2011) (citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010)). The relevant statutory section provides:

> **(c) Prompt medical attention.**—
> **(1) Prohibition.**—A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of an employee *who is injured during the course of employment*. If transportation to a hospital is requested by an employee who is injured during the course of employment, the railroad shall promptly arrange to have the injured employee transported to the nearest hospital where the employee can receive safe and appropriate medical care.
> **(2) Discipline.**—A railroad carrier or person covered under this section may not discipline, or threaten discipline to, an employee for requesting medical or first aid treatment, or for following orders or a treatment plan of a treating physician, except that a railroad carrier's refusal to permit an employee to return to work following medical treatment shall not be considered a violation of this section if the refusal is pursuant to Federal Railroad Administration medical standards for fitness of duty or, if there are no pertinent Federal Railroad Administration standards, a carrier's medical standards for fitness for duty. For purposes of this paragraph, the term "discipline" means to bring charges against a person in a disciplinary proceeding, suspend, terminate, place on probation, or make note of reprimand on an employee's record.

49 U.S.C. § 20109(c) (emphasis added).

Of course, "[i]f the statutory language is plain, we must enforce it according to its terms." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (citing *Hardt*, 560 U.S. at 251); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981))). "But oftentimes the 'meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.'" *King*, 135 S. Ct. at 2489 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)).

"[W]hen placed in context," *id.*, the plain meaning of subsection (c)(2), which prohibits "an employee for requesting medical or first aid treatment, or for following orders or a treatment plan of a treating physician," proves elusive.[3] Thus, we must rely upon "traditional tools of statutory interpretation." *Sierra Club v. EPA*, 793 F.3d 656, 665 (6th Cir. 2015). The Board primarily cites to the so-called *Russello* structural canon; Grand Trunk relies upon other textual context and structure, the absurdity canon, and the legislative history. These tools provide a framework for our analysis.

## A

The Board's argument depends heavily on one textual observation: the language under subsection (c)(1) includes a limitation—"A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of an employee who is ***injured during the course of employment***"—while subsection (c)(2) contains no such limitation.

The Board cites to *Russello v. United States*, 464 U.S. 16 (1983) and its progeny, which explained that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* at 23; *see, e.g.*, *Hardt*, 560 U.S. at 252; *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 671 (2008); *see also*

---

[3]The parties seem to acknowledge ambiguity because their arguments rely upon other tools of statutory interpretation. While the Board and Williams sporadically claim that the "plain meaning" dictates an answer in their favor, the very canon they rely upon presumes the need to employ tools of interpretation. *See, e.g.*, *Walter v. Hammons*, 192 F.3d 590, 596–98 (6th Cir. 1990).

*United States v. Detroit Med. Ctr.*, 833 F.3d 671, 678 (6th Cir. 2016); *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 580 (6th Cir. 2008).  While the Board's reliance on the *Russello* structural canon has some traction, its interpretation ultimately goes off the rails, effectively stranding the caboose from its engine.  *Russello* does not provide a dispositive canon.  Even at its strongest, *Russello* provides a single canon, a subset of a single tool of statutory interpretation, which may be displaced by other tools.  *See Henry Ford Health Sys. v. Dep't of Health and Human Servs.*, 654 F.3d 660, 666 (6th Cir. 2011) (*Russello* "creates a potential inference, not a necessary one.").

Employing those tools, the Third Circuit unanimously rejected the Board's identical *Russello* argument: "The *Russello* presumption only applies when two provisions are sufficiently distinct that they do not—either explicitly or implicitly—incorporate language from the other provision."  *PATH*, 776 F.3d at 164 (citing *Clay v. United States*, 537 U.S. 522, 530 (2003)). "Since the critical question here is *whether* subsection (c)(1) operates to cabin the scope of subsection (c)(2), *Russello* can only be meaningfully invoked after we resolve that inquiry. Consequently, it is of little help here."  *Id.* at 164.  Every other federal court since the *PATH* decision has followed the Third Circuit's lead.  *See Stokes v. Se. Penn. Transp. Auth.*, 657 F. App'x 79, 82 (3d Cir. 2016); *Murdock v. CSX Transp., Inc.*, No. 3:15-cv-1242, 2017 WL 1165995, at *3 (S.D. Ohio Mar. 29, 2017); *Miller v. BNSF Ry. Co.*, No. 14-2596, 2016 WL 2866152, at *15 (D. Kan. May 17, 2016); *Goad v. BNSF Ry. Co.*, No. 15-650, 2016 WL 7131597, at *3 (W.D. Mo. Mar. 2, 2016).

To be sure, *PATH*'s citation to *Clay* is open to some criticism.  After all, in *Clay*, the Supreme Court did not decline to rely on the *Russello* doctrine in determining the scope of the parallel provision; it instead invoked *Russello* to say that "an unqualified term . . . calls for a reading surely no less broad than a pinpointed [term.]"  *Clay*, 537 U.S. at 530.  Nevertheless, "[s]tatutory context," *PATH*, 776 F.3d at 165 (quoting *Carter v. Welles–Bowen Realty, Inc.*, 736 F.3d 722, 728 (6th Cir. 2013)), and structure explain why *Russello* does not control here.

The relevant section in this case, 49 U.S.C. § 20109(c), is structurally dissimilar to the relevant section in *Russello*, 18 U.S.C. § 1963(a).  In *Russello*, the narrower language in subsection (a)(2) *followed* subsection (a)(1); here, by contrast, the narrower language in

subsection (c)(1) defines the substantive protection against interference, which is then followed by a supplemental protection against retaliation in subsection (c)(2).  Put differently, in *Russello*, subsection (a)(2) does not *flow from* subsection (a)(1), but rather flows from a unifying section; here, by contrast, subsection (c)(2) *flows from* subsection (c)(1)—subsections (c)(1) and (c)(2) prohibit not only interference with "medical or first aid treatment of an employee who is injured during the course of employment," but also discipline to the "employee for requesting [that] medical or first aid treatment, or for following [the resultant] orders or a treatment plan of a treating physician."  49 U.S.C. § 20109(c)(1)–(2).[4]  When it comes to § 20109(c), it appears Congress did not give the caboose its own engine.  *See PATH*, 776 F.3d at 163 ("Congress did not intend subsection (c)(2) to be a vehicle for advancing an independent objective.").[5]

Further, the title of subsection (c), "Prompt medical attention," also supports a harmonious reading of subsections (c)(1) and (c)(2), one that ensures railroad employees receive such attention for on-the-job injuries and occupational illnesses and do not face discipline or retaliation for doing so.[6]  The Board does not argue a railroad's duty to provide "[p]rompt medical attention" (and the corresponding protections from discipline) extends beyond the work environment, so it remains difficult to see how subsection (c)(2) should not be read in light of subsection (c)(1)'s scope.

In light of the statutory structure and context, subsections (c)(1) and (c)(2) should be read together to determine the scope of protected activity.  The purpose of subsection (c)(1) is to

---

[4]The *in pari materia* canon supports giving the same meaning of the *identical* phrase, "medical or first aid treatment," in both subsections (c)(1) and (c)(2).  *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 260 (1993).  This has implications, as will be demonstrated below.

[5]Moreover, the *Russello* "presumption is based on . . . 'a hypothesis of careful draftsmanship,'" *PATH*, 776 F.3d at 165 (quoting *Kapral v. United States*, 166 F.3d 565, 579 (3d Cir. 1999) (Alito, J., concurring)).  As the Third Circuit noted, the "hypothesis of careful draftsmanship . . . is at least partially eroded by numerous examples of inexact drafting in § 20109."  *Id.* (citing *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435–36 (2002); *accord Clay*, 537 U.S. at 532 (quoting *Columbus*, 536 U.S. at 435–36) ("The *Russello* presumption . . . grows weaker with each difference in the formulation of the provisions under inspection.").

[6]While "the title of a statute and the heading of a section cannot limit the plain meaning of the text," *Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947), they can "assist in clarifying ambiguity."  *Minn. Transp. Reg. Bd. v. United States*, 966 F.2d 335, 339 (1992).  And the text in subsections (c)(1) and (c)(2) is not so "prolific" to prevent reading anything into its succinct title.  *Cf. Bhd. of R.R. Trainmen*, 331 U.S. at 528.

ensure employees receive prompt medical attention if they are injured on the job; the anti-retaliation provision, subsection (c)(2), effectuates that purpose by protecting medical treatment for work injuries. *See PATH*, 776 F.3d at 164 n.11 (citing *Burlington N. and Sante Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006)) (noting that in *Burlington*, the Supreme Court "was not confronted with an argument that the two sections actually referred to each other, as we are here").**[7]**

The Third Circuit seemed wary of accepting the wide-reaching implications of relying only on the *Russello* canon under these circumstances, and so are we. "Holding otherwise, as the [Board] did, would seem to foreclose the possibility that a statute could reference another provision without expressly saying so. That, of course, is contrary to Supreme Court precedent." *PATH*, 776 F.3d at 164 n.10 (citing *United States v. Navajo Nation*, 556 U.S. 287, 299 (2009); *Melkonyan v. Sullivan*, 501 U.S. 89, 94 (1991)). In short, subsections (c)(1) and (c)(2) are structurally and logically married, joined under a title—"Prompt medical attention"—that limits both of its subsections together to injuries sustained "during the course of employment."

A closer examination of the statutory structure implicit in the Board's position only reinforces our belief that Congress did not intend to hide a far-reaching reading in a mousehole.

**B**

Grand Trunk's characterization that the Board's reading of the statute creates uncontrolled, unlimited sick time for all railroad employees—or "absurd" results—is overstated. After all, subsection (c)(2) includes a provision designed to prevent the proverbial train wreck:

> **(2) Discipline.**—A railroad carrier or person covered under this section may not discipline, or threaten discipline to, an employee for requesting medical or first aid treatment, or *for following orders or a treatment plan of a treating physician,* <u>except that a railroad carrier's refusal to permit an employee to return to work following medical treatment shall not be considered a violation of this section if the refusal is pursuant to Federal Railroad Administration medical</u>

---

**[7]***PATH*'s treatment of *Burlington* is also open to some criticism because it failed to address the Supreme Court's principal holding that substantive and antiretaliation provisions advancing the same purpose need not be "coterminous," and that antiretaliation provisions *may* sweep more broadly than the substantive provisions to which they relate. *Burlington*, 548 U.S. at 67 ("Interpreting the antiretaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends.").

standards for fitness of duty or, if there are no pertinent Federal Railroad Administration standards, a carrier's medical standards for fitness for duty. . . .

49 U.S.C. § 20109(c)(2) (emphasis added). In many circumstances, if a person were to receive a doctor's order that provided for "unlimited sick time," that person would not meet "medical standards for fitness of duty." *See id.* This exception thus cabins the parade of horribles.

Nevertheless, even if the Board's reading would not create *absurd* results, it seems unlikely that Congress hid such an elephant in the § 20109(c)(2) mousehole. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).[8]

The Board agrees that the limiting language in subsection (c)(1)—"during the course of employment"—only applies to bar interference with medical or first aid treatment for injuries that arise from work, or injuries "sustain[ed] on duty." Resp't Br. at 25; *see id.* at 23 ("[S]ection 20109(c)(1)'s protection is, for obvious reasons, explicitly limited to circumstances involving such [on-duty] injuries . . . ."); *see In the Matter of Anthony Santiago*, No. 10-147, 2012 WL 3255136, at *7 (Admin. Rev. Bd. July 25, 2012) ("We hold that subsection 20109(c)(1) bars a railroad from denying, delaying, or interfering with an employee's medical treatment throughout the period of treatment and recovery from a *work injury*.") (emphasis added).

That reading of subsection (c)(1) is difficult to square with the Board's reading of subsection (c)(2). Subsection (c)(2) first provides that a railroad carrier may not retaliate against "an employee *for requesting* medical or first aid treatment." 49 U.S.C. § 20109(c)(2) (emphasis added).[9] If Congress had intended subsection (c)(2) to cover off-duty injuries, why would it have included the "for requesting" language? If an employee who is *not* injured "during the course of employment," § 20109(c)(1), would not "request[] medical or first aid treatment,"

---

[8]Congress has expressly provided other robust remedial schemes to protect workers like Williams, including the FMLA, the Americans with Disabilities Act (ADA), and so forth.

[9]Subsection (c)(1) includes "requested" in this context: "If transportation to a hospital is *requested* by an employee who is injured during the course of employment, the railroad shall promptly arrange to have the injured employee transported to the nearest hospital where the employee can receive safe and appropriate medical care." 49 U.S.C. § 20109(c)(1) (emphasis added). This precedes "*requesting* medical or first aid treatment" in subsection (c)(2).

§ 20109(c)(2), at work, then the Board must assert the text bears a different scope for the connecting clause—"or for following orders or a treatment plan of a treating physician":

> **(c) Prompt medical attention.**—
> **(1) Prohibition.**—A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment. . . .
> **(2) Discipline.**—A railroad carrier or person covered under this section may not discipline, or threaten discipline to, an employee *for requesting* medical or first aid treatment, or for following orders or a treatment plan of a treating physician, except that a railroad carrier's refusal to permit an employee to return to work following medical treatment shall not be considered a violation of this section if the refusal is pursuant to [FRA] medical standards for fitness of duty or, if there are no pertinent [FRA] standards, a carrier's medical standards for fitness for duty. . . .

49 U.S.C. § 20109(c) (highlighting and emphasis added) (on-duty; off-duty). This elephant-in-mousehole construction, *see Whitman*, 531 U.S. at 468, would not foster a "symmetrical and coherent regulatory scheme." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995).

The Board's responses to these contextual and structural arguments essentially sound in public policy: "[T]ying subsections (c)(1) and (c)(2) so tightly together narrows the effect of the provision in a manner that is inconsistent with FRSA's central purpose." Resp't Br. at 19–20. To the extent the Board invites us to engage in purposivism, let's look to the legislative history.

## C

While reliance on legislative history has become less prevalent over time, "substantive canons have not displaced legislative history." Anita S. Krishnakumar, *Reconsidering Substantive Canons*, 84 U. Chi. L. Rev. 825 (2017) (noting "eight of the eleven justices who have served on the Roberts Court . . . referenced legislative history more often than they referenced substantive canons in the opinions they authored"); *see, e.g., Corley v. United States*, 556 U.S. 303, 319–20 (2009); *see also Sierra Club*, 793 F.3d at 665; *cf. I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 432 n.12 (1987) (noting a "clearly expressed legislative intention contrary to [the plain] language" can lead to a different result). After all, "[i]n construing statutes, our primary goal is to *effectuate legislative intent*." *Estate of Gerson v. Comm'r*, 507 F.3d 435, 439 (6th Cir. 2007) (emphasis added).

The legislative history favors Grand Trunk's, and not the Board's, position.  In 2008, Congress added several amendments to the FRSA's employee-protection provisions.  These amendments included measures to "strengthen existing whistleblower protections for railroad employees . . . . [and] [p]rohibit railroad carriers from interfering with the medical treatment of injured workers."  H.R. Rep. No. 110-336, at 59 (2007).[10]  Relevant to this case, the latter amendment codified at 49 U.S.C. § 20109(c) was proposed in response to federal court decisions finding similar state laws pre-empted by certain Federal Railroad Administration regulations.  The federal provision was enacted "for the protection of injured workers," ensuring "immediate medical attention free from railroad interference."  *H. Comm. on Transp. and Infrastructure*, *The Impact of Railroad Injury, Accident and Discipline Policies on the Safety of America's Railroads*, at xiii (Oct. 22, 2007); *see Rail Safety Legislation: Hearing Before the Subcomm. on R.Rs., Pipelines, and Hazardous Materials of the H. Comm. on Transp. and Infrastructure*, 110th Cong. 45 (2007) (testimony of Mr. Pickett, International President, Brotherhood of Railroad Signalmen) ("The [bill] provides language to ensure that all injured railroad employees get the proper medical treatment for any on-job injuries.").  An add-on discipline, or retaliation, provision was also enacted to protect a worker from prospective pressure that might deter him from requesting the first aid or medical treatment that would trigger an on-the-job injury "report."  *Id*. at 161 (joint statement of the Teamsters Rail Conference and the United Transportation Union).[11]

---

[10]The first amendment transferred responsibility for employee whistleblower protection from the Railroad Labor Act's arbitration process to the Secretary of Labor, consistent with other federal whistleblower statutes. It also added 49 U.S.C. § 20109(a)(4), which protects an employee from retaliation for *reporting* his own workplace injury.

[11]Only work-related injuries must be reported to the Federal Railroad Administration (FRA).  *See* 49 C.F.R. §§ 225.11, 225.19(d).  The reporting processes require each railroad to implement an Internal Control Plan ("ICP") to help ensure complete and accurate reporting of on-the-job injuries; ICPs must address intimidation and harassment calculated to prevent or discourage any employee from receiving proper medical treatment for a workplace injury.  49 C.F.R. § 225.33.  These regulations were implemented because of concerns that railroad companies were manipulating the reportability of on-the-job incidents.  In 2005, motivated by similar concerns that rail carriers may have been denying or interfering with the medical treatment of injured employees, Illinois and Minnesota passed statutes requiring railroads to provide "prompt medical treatment" to injured employees.  These laws were found pre-empted by the FRA's regulations mandating the use of ICPs.  *See, e.g.*, *BNSF Ry. Co. v. Swanson*, 533 F.3d 618 (8th Cir. 2008).  In response to the pending litigation, Representative James Oberstar introduced the federal amendment relevant to this case.  *See H. Comm. on Transp. and Infrastructure*, *The Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads*, 110th Cong. at xiii (2007). The relevant provisions in this case supplemented protections for workers beyond mere reporting requirements.

The legislative record repeatedly refers to "on-the-job" injuries and occupational illnesses; yet it does not even suggest that subsection (c)(2) was intended to operate as an FMLA-style subsection for railroad employees. In short, nothing suggests that *anyone* at the time—including the Unions themselves[12]—contemplated that the simple clause in § 20109(c) would encompass non-work-related illnesses or injuries.

The remedial avenues under this statutory section reinforce the legislative intent. The retaliation claim in this case necessarily arose through OSHA's administrative processes. In response to "personal injuries and illnesses *arising out of work situations*," Congress created OSHA primarily to "assure so far as possible every working man and woman in the Nation [enjoys] safe and healthful working conditions." 29 U.S.C. § 651(a)–(b) (emphasis added). The statutory scheme does not support a conclusion that Congress (or the Department of Labor) intended OSHA to handle retaliation claims in connection with off-duty illnesses and injuries.[13]

In sum, the Board even concedes "that much of the legislative history discusses on-duty injuries," and "it has been unable to point to any express evidence that the policy now advances was ever considered by anybody at any point in the legislative process." *PATH*, 776 F.3d at 168.

---

As one witness testified, an "injured employee should not have to worry about reporting an injury, let alone getting the proper treatment for that injury." *See Rail Safety Legislation: Hearing Before the Subcomm. on R.Rs., Pipelines, and Hazardous Materials of the H. Comm. on Transp. and Infrastructure*, 110th Cong. 51 (2007) (testimony of Mr. Pickett, International President, Brotherhood of Railroad Signalmen).

[12]Take just one additional example. In a joint statement to the House of Representatives, the Teamsters Rail Conference and the United Transportation Union distilled § 20109(c) to "require[] a rail carrier to provide rail workers with immediate medical attention when the workers are *injured on the job*," and in their comment that followed, gave absolutely no indication that protection for "simply following the plan of a treating physician" had any independent, off-duty application. *See Rail Safety Legislation: Hearing Before the Subcomm. on R.Rs., Pipelines, and Hazardous Materials of the H. Comm. on Transp. and Infrastructure*, 110th Cong. 169–70 (2007) (joint statement of the Teamsters Rail Conference and the United Transportation Union) (emphasis added).

[13]Since the legislative history does not support an extension of subsection (c)(2) to non-work injuries and illnesses, the so-called remedial, or liberal construction, canon is unpersuasive in this context. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 504 (1999) (Stevens, J., dissenting) ("It has long been a 'familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes.'" (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967))). "The rule of liberal construction does not override other rules where its application defeats the intention of the legislature . . . ." 3 Norman J. Singer and Shambie Singer, *Sutherland Statutory Construction* § 60:1 (7th ed. 2008); *see also Estate of Gerson*, 507 F.3d at 439 ("[O]ur primary goal is to effectuate legislative intent.").

**D**

As a final matter, *Chevron* deference is inapposite under these circumstances. "An agency's interpretation is not entitled to *Chevron* deference, for example, if the apparent statutory ambiguity can be resolved using 'traditional tools of statutory construction.'" *Mid-Am. Care Found. v. N.L.R.B.*, 148 F.3d 638, 642 (6th Cir. 1998) (quoting *Cardoza-Fonseca*, 480 U.S. at 446); *see, e.g.*, *Owensboro Health, Inc. v. U.S. Dep't of Health and Human Servs.*, 832 F.3d 615, 620 (6th Cir. 2016) (rejecting *Chevron* deference after finding "the entire statutory phrase" in context unambiguous). And the Board fares no better in the end by citing to *Skidmore* "deference" because we "find the [Department's] interpretation . . . unpersuasive." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 161 (2012) (employing "traditional tools of interpretation" to reject the Department of Labor's interpretation).

In short, because traditional tools resolve any "apparent statutory ambiguity" in Grand Trunk's favor, *Chevron* and *Skidmore* do not resuscitate the Board's position.

**III**

In sum, we join every other federal court that has interpreted 49 U.S.C. § 20109(c) and reject the Board's reliance on *Russello*. We therefore **GRANT** the petition and **REMAND** this matter to the Board with instructions that it dismiss the proceeding below.

---

## CONCURRENCE

---

JANE B. STRANCH, Circuit Judge, concurring.  I write separately to comment on the Board's adherence to the same position it advanced before the Third Circuit in *PATH*.  There, the Board also argued (albeit unsuccessfully) that § 20901(c)(2) covers injuries and illness that were not sustained during the course of employment.  I do not think it was unreasonable for the Board to continue to advance that position in this litigation.  Apart from today's decision, *PATH* remains the only published circuit court opinion that addresses the specific statutory interpretation question at issue in this case.  (And I agree with the majority opinion that *PATH* itself is open to some criticism.)  The other cases that the majority opinion identifies as having rejected the Board's position include an unpublished Third Circuit decision citing *PATH* but interpreting a different subsection, *see Stokes v. Se. Pa. Transp. Auth.*, 657 F. App'x 79, 82 (3d Cir. 2016) (applying 49 U.S.C. § 20901(b)), and three district court decisions, one of which post-dated the decision of the Board at issue in this appeal, *see Murdock v. CSX Transp., Inc.*, No. 3:15-cv-1242, 2017 WL 1165995, at *3 (S.D. Ohio Mar. 29, 2017); *Miller v. BNSF Ry. Co.*, No. 14-2596, 2016 WL 2866152, at *15 (D. Kan. May 17, 2016); *Goad v. BNSF Ry. Co.*, No. 15-650, 2016 WL 7131597, at *3 (W.D. Mo. Mar. 2, 2016).  In this context, I do not think the Board should be criticized for its good faith effort to advocate for a reasonable interpretation of § 20901(c)(2).  This is, after all, how important issues percolate through the judicial system toward ultimate resolution.  But even though I think the Board was entitled to make its case, I nevertheless agree that Grand Trunk's interpretation is ultimately more persuasive for the reasons stated in today's opinion.